BAKER ET AL. *v.* STANDARD LIME AND STONE
COMPANY ET AL.
(Five Appeals in One Record)
[No. 28, October Term, 1953.]

272

*Decided December 4, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*George Ross Veazey* for the appellants.

*Harry N. Baetjer,* with whom were *Venable, Baetjer & Howard* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree dismissing a bill of complaint filed by David B. Baker and his wife and children, dissenting common stockholders of The Standard Lime and Stone Company, a Maryland corporation, challenging the validity of certain amendments to the corporate charter made in 1950, authorizing the issue and sale of its preferred stock, the purchase and retirement of shares of its common stock, and a split up of the outstanding common stock. The relief prayed is either payment to them of the fair value of their respective shares or, in the alternative, injunctive relief against the amendments and the cancellation thereof, the cancellation of the preferred stock issued pursuant to the amendments, and the recovery of the moneys paid for the common stock purchased by the corporation and retired.

The financing out of which the controversy arises involves a sale by the corporation to the Massachusetts Mutual Life Insurance Company of 7600 shares of preferred stock at par ($100 per share) and accrued dividends, a total consideration of $760,000 and the application of the proceeds thereof to the purchase of 7992 shares of common stock of the company at $95 a share, a total consideration of $759,240, from the beneficiaries under the will of Joseph D. Baker, deceased, including the estate of his son Holmes D. Baker, his daughter Charlotte Baker King, the trustee under the will of the decedent for his daughter for life and the Bucking-

ham School of Frederick County, Maryland, an eleemosynary institution, a total of 7000 shares, together with 892 shares theretofore owned by Holmes D. Baker and purchased from his estate and 100 shares theretofore owned by Charlotte Baker King individually. Neither the insurance company nor any of the vendors of the common stock are parties to this proceeding. The common stock bought at $95 a share and retired is of the same issue as the stock which the appellants demand that the company acquire from them at $150.95 a share.

The appellees filed a combined demurrer and answer and a motion to dismiss. By stipulation it was agreed that the whole cause be heard finally on the record as made to the date of the hearing on December 15, 1952.

Standard Lime is a Maryland corporation organized in 1927 to carry on a business established, owned and directed by the Baker family, of which the appellants and the individual appellees are all members. During the entire period of the corporate existence, until the resignation of David B. Baker in 1949, the individual appellees and David B. Baker were officers and directors of the company. David B. Baker held the position of vice president, and received the same salary as the others. The authorized capitalization of the company consisted originally of 200,000 shares of common stock without par value, of which 120,000 shares were issued to the organizers, all members of the Baker family. During the period from the time of organization to 1946 the business of the company flourished and the value of its stock greatly increased.

In 1946 certain stockholders desired to dispose of some of their stock, because, at its enhanced value, it constituted such a large part of their property that it was deemed advisable to reduce their relative investment for diversification and to provide funds for estate taxes. Accordingly a plan was adopted whereby the company sold 25,000 shares of redeemable preferred stock, of the par value of $100 a share, to the Massachusetts Mutual for $100 a share, or a total considera-

tion of $2,500,000. With these funds the company purchased from the stockholders who desired to sell, and retired, a total of 41,666 shares at $60 per share, or an aggregate price of $2,499,960. Other stockholders, the appellant, David B. Baker and the individual appellees, purchased from the same vendors an aggregate of 14,270 shares at the same price.

The record shows that this plan of financing and the charter amendments required to make it effective were unanimously approved by the directors and stockholders, including the appellant, David B. Baker, who then owned all the shares held by the appellants and who subsequently gave to the other appellants, his wife and children, the shares owned by them. Moreover, the appellant, David B. Baker, along with all the other holders of common stock, surrendered the certificates they then held in exchange for new certificates upon which were printed all of the 1946 amendments defining the terms of the stock and the rights of and restrictions upon the holders thereof, including the following:

"The corporation reserves the right to make, from time to time, any amendments of its charter which may now or hereafter be authorized by law, including, without limitation, any amendments changing the terms as expressed in the charter, or any amendment thereof, of any class of its outstanding stock by classification, reclassification or otherwise; and the affirmative vote of stockholders required to make each such amendment valid and effective shall be two-thirds of the common stock and two-thirds of the preferred stock outstanding at the time of such vote; provided, however, that no such amendment shall be effective to reduce the dividend rate or the redemption price of the preferred stock without the consent of all the holders thereof."

On the face of each certificate there appeared the following notice: "A statement of the rights, privileges, appurtenances and voting powers and of the restrictions and qualifications of the Preferred and Common stocks of the Corporation are printed on the back hereof to

all of which the holder by acceptance hereof assents."

In 1950 the corporation had continued to prosper and another financial plan was brought forward along the lines of the 1946 plan. The preferred stock held by the insurance company had been reduced by retirement from 25,000 to 20,750 shares. There were 78,334 shares of common stock outstanding. Following the death of Holmes Baker, his executors approached the company to buy the shares held by him individually and as trustee under his father's will, and the shares of his sister. The company agreed to buy 7,992 shares at $95 a share. To provide funds, 7,600 shares of preferred were to be issued and sold to the insurance company. The common stock purchased was to be retired; the remaining shares of common outstanding after such retirement were to be reclassified into four shares without par value for each share without par value.

An amendment to the charter to authorize these changes in capitalization was approved by the directors and stockholders. 55,755 shares of the common stock out of 78,334 shares, or 71% of the common, were voted in favor of the proposal. The proxy for the 11,153 shares held by appellants voted against the amendment. 10,996 shares were not voted.

On the question as to the right of the dissenting stockholders to demand payment of the appraised value of their shares, we think the appellants' claim is without merit. There is nothing in the charter of the appellee corporation giving dissenting stockholders the right to receive payment of the appraised value of their shares in the event of an amendment changing the terms of their stock. Under the Maryland statutes in effect when the company was organized in 1927, no appraisal right was recognized in the event of a charter amendment, although a right of appraisal was conferred in the event of a consolidation, or a sale of substantially all of its assets by a corporation. See 1924 Code, Article 23, Sections 33, 35 and 36. The reason is clear. The statute, Chapter 309, Section 24, Acts of 1922 (1924 Code, Article

23, Section 28), provided that "No amendment of the charter of a corporation shall be valid which changes the terms of any of the outstanding stock by classification, reclassification or otherwise, in the absence of a reservation in the charter of a right to make such amendment, unless such change in the terms thereof shall have been authorized by the holders of all of such stock at the time outstanding, by vote at a meeting or in writing with or without a meeting; and in the case of any such change of terms of outstanding stock, the articles of amendment shall, in addition to other matters required by law, affirmatively set forth that the holders of such stock have duly authorized such change of terms. The word 'terms' as used in this section in reference to stock is intended to mean only the contract rights of the holders thereof as expressed in the charter and shall be so construed." Since unanimous consent was required, there could be no occasion for any appraisal right. Dissent would simply defeat the proposal. See *Brune, Maryland Corporation Law and Practice,* Sections 115, 120 and 122.

This situation was changed by the enactment of Chapter 451, Acts of 1949 (amending Section 28, Article 23 of the 1939 Code) which was in effect when the 1950 financing was completed. The purpose and effect of this enactment is thus described in the explanatory notes by the Reporter to the Commission to Revise the Corporation Laws appointed in 1948, printed in pamphlet of the State Tax Commission, June 1, 1951, p. 98:

"Prior to 1949, any corporation, wishing to amend its charter in any way which altered the 'contract rights' of outstanding stock, had to obtain the concurrence of every stockholder affected, if the charter did not reserve the right to make such amendment. This proved an unduly restrictive and, in some cases, a clearly inequitable, provision, and as a result there was enacted, by Chapter 451 of the Acts of 1949, an amendment to Section 28, allowing the corporation to make such an amendment by a two-thirds vote of stockholders, if the corporation is subject to the jurisdiction of the

Public Service Commission or if the stock affected was issued on or after June 1, 1949, but giving appraisal rights to dissenting stockholders whose contract rights as expressly set forth in the charter were altered. This provision, along with the other broad powers of amendment now in the statute, has been carried forward into proposed Section 10 [1951 Code, Article 23, Section 10]; however, the power to alter contract rights by amendment and the right of appraisal in such cases have been broadened to include not only stock issued on or after June 1, 1949, but also stock outstanding on that date."

It is clear that the enactment of Chapter 451, Acts of 1949 left the law unchanged as to "outstanding stock issued prior to June 1, 1949." See *Brune, Maryland Corporation Law and Practice,* Section 122. It is conceded that some of the shares held by the appellants in 1950 had been transferred on the books after June 1, 1949, as gifts from David B. Baker to his family, and it is contended that as to these shares, at least, a right of appraisal exists. But we think the Act of 1949, conferring the right of appraisal, cannot be construed to include shares of previously issued stock transferred after its effective date. Not only is the language plain, but the contract rights of the holders became fixed upon the date of issue, not upon the date of transfer. A certificate of stock is not the stock itself, but a mere evidence of ownership and the holder's rights as a stockholder. *McCormick v. Frisch,* 199 Md. 181, 185, 85 A. 2d 793, 794. Cf. *Lake Superior Dist. Pow. Co. v. Public Service Commission,* 26 N. W. 2d 278, 282 (Wis.). We express no opinion as to the effect of the subsequent amendment of the statute in 1951.

The appellants contend, however, that if they are not entitled to payment for any of their shares, all of which were issued prior to 1949, although some of the certificates bear a later date, they nevertheless have a right to set aside the financial plan completed in 1950, over their objection, by more than a two-thirds but less than a unanimous vote. Passing the point that all of

the participants in the plan are not parties, the invalidity of the 1950 amendment must depend upon the invalidity of the amendment in 1946 reserving the right to make future amendments changing the terms of outstanding stock by a two-thirds vote. The Act of 1949, c. 451, sec. 28(d), expressly recognizes that the terms of outstanding stock issued prior to June 1, 1949 may be changed, if there is a reservation in the charter of the right to make such amendment.

The appellants attack the validity of the 1946 amendment on several grounds. They say that while the minutes show that the vote was unanimous, in fact one of the proxies did not vote or did not produce at the meeting a power of attorney authorizing the vote. The testimony shows that this stock was voted by a person then holding a validly executed power of attorney. They say that the articles of amendment filed with the State Tax Commission did not state that the vote was unanimous, but merely that the amendment was adopted by the vote of the holders of two-thirds of each class of stock. We think these objections as to form are not fatal, in the absence of any reliance upon the inaccurate statement of record. See *McQuillen v. National Cash Register Co.*, 27 F. Supp. 639, aff'd 112 F. 2d 877 (CCA 4th), cert. den. 311 U. S. 695; reh. den. 311 U. S. 729. It is admitted that David B. Baker, who then owned all of the shares held by the appellants, was present and voted for the amendment. Moreover, even if we assume that there were serious defects in the procedures, these defects were cured by the subsequent unanimous approval of the 1946 amendment by exchange of all the outstanding stock certificates and the acceptance of new ones containing the charter amendment. See *Henry v. Markesan State Bank*, 68 F. 2d 554 (CCA. 8th). Cf. *Jackson v. Walsh*, 75 Md. 304, and *Pocomoke City National Bank v. Crockett*, 145 Md. 435. See also 7 *Fletcher, Corporations*, Sections 3728 and 3735.

The appellants assert that there was another defect in the adoption of the amendment, in that some, if not

all, of the persons voting for the amendment were disqualified from voting because the amendment contemplated, and made possible, a sale of their stock to the corporation. Paragraph 8 of the original certificate of incorporation expressly provided: "The said corporation is hereby authorized at any time and from time to time to purchase, in accordance with the laws of Maryland, any shares of its own stock." The Maryland law permits this. *R. & F. Products Corp. v. Rosenthal,* 153 Md. 501, 514. Thus the power existed prior to the proposed amendment. It is not seriously suggested that the vote on the amendment obligated the corporation to make the purchase. Under the circumstances, we think the prospective sellers were not disqualified from voting on the provision authorizing changes in the terms of outstanding stock with the consent of two-thirds of each class of stock, whatever the situation might be as to their right, as sellers, to vote on the proposed purchase.

The appellants contend that even if the amendment of 1946 was validly adopted or they are estopped from challenging it, it was not intended to cover the kind of transaction completed in 1950, and, since it only reserved the right to make amendments "which may now or hereafter be authorized by law," they may challenge both the scope and legality of the 1950 transaction.

On the first point we have already noted that the word "terms" in the Act of 1922 was defined to mean "only the contract rights of the holders thereof as expressed in the charter." The appellants seem to argue that when the 1946 amendment was adopted the word "terms" was not intended to cover any rights to preference upon distribution of assets or any rights to undeclared dividends, as spelled out in the Acts of 1949, c. 451, sec. 28(c). This section provides, however, that "This definition shall not be construed as implying that in the absence thereof, the word 'terms' as used in this section could properly be otherwise construed." If we assume that the rights to preference and dividends

were adversely affected by the issuance of preferred stock in 1950, and these rights were not within the scope of the Act of 1922 and the charter amendment of 1946, it would seem to follow that these are not contract rights at all.

The statutes in effect when the corporation was organized authorized the creation of preferred stock. Section 38, Article 23, of the 1924 Code (Chapter 309, Section 34, Acts of 1922). This provision of law entered into and formed a part of the contract between the corporation and its stockholders. It is settled practice in Maryland to issue preferred stock under an amendment approved by the holders of two-thirds of the shares outstanding, and it may be doubted whether the creation of preferred stock having priority over the common in this manner, is an amendment changing the terms of the common stock. See 11 *Fletcher, Corporations,* Section 5284, and 13 *Fletcher, Corporations,* Section 5776, and cases cited. If the right to issue the preferred stock was a reserved right, it would remain unaffected by the amendment, and if it was not, it was within the scope of the amendment approved by unanimous consent.

On the second point, that the 1950 amendments were not authorized by law, we have shown that the issuance of the preferred, outranking in priority an existing issue of common stock, either did not violate any contract right or was covered by the amendment. Likewise, the purchase and retirement of outstanding shares of the common stock was authorized by the original charter and unaffected by the amendment. Obviously, the split up of the common stock, by the issuance of four shares for one, did not adversely affect the holders, for after that action their aliquot shares remained the same. *Pub. Serv. Comm. v. Consol. Gas Co.,* 148 Md. 90, 99; *McCormick v. Frisch,* supra.

The chief contention of the appellants seems to be that their property and voting rights were seriously affected because, after the 1950 financing was completed

and as a result of the retirement of the shares purchased, the corporate control was shifted into the hands of the individual appellees. It is shown that while the interest of David B. Baker and family increased from 14.79 per cent to 16.47 per cent by reason of the action taken, the interests of John H. Baker, Daniel Baker, Jr., and Joseph D. Baker, Jr., increased in the aggregate from 46.90 per cent to 52.23 per cent. The appellants say that this was the whole intent and purpose of the plan.

We may assume that if the plan were shown to be illegal, *ultra vires* or fraudulent, it might be set aside by a court of equity. *Shaw v. Davis,* 78 Md. 308, 316. We may also assume that an equity court may set aside a transaction whereby majority stockholders use their voting power for their own benefit, for some ulterior purpose adverse to the interests of the corporation and its stockholders as such. *Cooperative Milk Service v. Hepner,* 198 Md. 104, 114, 81 A. 2d 219, 224. We have no such case here. It is manifest that the purchase of the shares was beneficial to the company. The appellants concede that the price of $95 per share was less than its full value. The advantageous bargain enured to the benefit of the appellants equally with the other holders of the Company's common stock. The record shows clearly that the plan did not originate with the individual appellees. The offer to sell was put forward by stockholders who desired to sell because of their personal investment problems. The Company offered to buy the appellants' shares at the same price but they declined.

The result of the financing did not diminish the appellants' equity. Before the financing in 1950 there were 78,334 shares outstanding and the surplus was $7,818,780.95 or $99.81 per share; after the financing in 1950 there were 70,342 shares outstanding and the surplus was $7,259,340.75 or $103.20 per share. As a result of the financing, 7,992 shares were purchased and they were paid for as to $25 per share out of

capital and as to $70 per share out of surplus. There was a reduction in the capital and surplus but there was a reduction in the number of shares to participate therein, equal to the number of shares retired. The capital remained the same and the surplus per share increased slightly.

It is always true that the purchase and retirement of some shares of common stock necessarily have the effect of increasing the proportionate voting power of all the other holders of common stock. But the appellants' percentage of votes was increased in the same proportion as the individual appellees. They lost no voting power by the transaction, but were and remain minority stockholders. The fact that in the instant case the individual appellees, collectively, gained a majority of the voting stock is not in itself a badge of fraud. Indeed, fraud is not alleged. There is no allegation or suggestion that the individual appellees were bound or committed to vote in concert for any future proposal concerning the company's affairs. The majority voting power they now possess they formerly shared with the holders of the shares retired.

What was said by Circuit Judge Gray in *Allen v. Francisco Sugar Co.*, 193 F. 825, 841 (CCA. 3rd), seems apposite here:

"In the absence of any facts well pleaded, which, if true, would impute fraud to the defendant, we cannot, on a mere suggestion of interested motives on the part of the defendants, in attempting to carry out their proposal, by bringing about a retirement of stock permitted and favored by law, and in the mode and manner prescribed by the law, find any equity in the complainant's position that would entitle him to the relief sought by the bill of complaint. It does not need the array of authority cited by the counsel for the appellees to establish the proposition that, in the respects herein under consideration, the majority of the stockholders are not trustees for a dissentient stockholder, and have a clear right to vote on the ground of what they consider

their own interests, in the acceptance or rejection of the offered plan for reducing the stock of the corporation. It seems to be a clear case of a mere difference of opinion between a large majority of the stockholders and the dissentient stockholder, who is the complainant. If the defendant should hereafter abuse the power he has acquired by ownership of the majority of the stock of the defendant corporation, the complainant, or any other minority stockholder, has ample remedy to restrain such abuse of power and obtain redress therefor by public or private suit. But the mere averment that power lawfully obtained may be, or often is intended to be, thereafter unlawfully or oppressively used by the defendant, presents no ground for equitable relief."

*Degree affirmed, with costs.*