282 F.3d 162
 Robert STROUGO, on behalf of the Brazilian Equity Fund, Inc., Plaintiff-Appellant,
v.
Emilio BASSINI, Richard Watt, Daniel Sigg, Dr. Enrique R. Arzac, James J. Cattano, George W. Landau, Martin M. Torino, Bea Associates, and The Brazilian Equity Fund, Inc., Defendants-Appellees.
 Docket No. 00-9303.
 United States Court of Appeals, Second Circuit.
 Argued April 17, 2001.
 Decided February 28, 2002.
 
 COPYRIGHT MATERIAL OMITTED Joel C. Feffer, Wechsler, Harwood, Halebian & Feffer LLP (Daniella Quitt, of counsel), New York, NY, for Plaintiff-Appellant.
 Jack C. Auspitz, Morrison & Foerster, New York, NY (on the brief), for Defendants-Appellees Enrique R. Arzac, James J. Cattano, George W. Landau, Martin M. Torino, and Brazilian Equity Fund, Inc.
 Lawrence O. Kamin, Willkie Farr & Gallagher (Daniel B. Rosenthal, of counsel), New York, NY, for Defendants-Appellees BEA Associates, Emilio Bassini, Richard Watt, and Daniel Sigg.
 Before: LEVAL, SACK, and SOTOMAYOR, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 Plaintiff Robert Strougo appeals from a judgment of the United States District Court for the Southern District of New York (Robert W. Sweet, Judge) granting the defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss the complaint for failure to state an actionable claim. The complaint includes, inter alia, class action claims on behalf of shareholders of an investment fund against the fund's management. The district court dismissed these claims on the ground that redress for the injuries alleged could only be sought through derivative, and not direct, claims.[1] Because we conclude that the plaintiff alleged injuries that support direct claims, we vacate the judgment of the district court in part and remand for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 2
 The plaintiff is a shareholder of the Brazilian Equity Fund, Inc. (the "Fund"), a non-diversified, publicly traded, closed-end investment company incorporated under the laws of Maryland and registered under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1 et seq. (the "ICA"). As its name implies, the Fund invests primarily in the securities of Brazilian companies. The term "closed-end" indicates that the Fund has a fixed number of outstanding shares, so that investors who wish to acquire shares in the Fund ordinarily must purchase them from a shareholder rather than, as in open-end funds, directly from the Fund itself. Shares in closed-end funds are thus traded in the same manner as are other shares of corporate stock. Indeed, shares in the Fund are listed and traded on the New York Stock Exchange. The number of outstanding shares in the Fund is described as "fixed" because it does not change on a daily basis as it would were the Fund open-end, in which case the number of outstanding shares would change each time an investor invested new money in the fund, causing issuance of new shares, and each time a shareholder divested and thereby redeemed shares.
 
 
 3
 Although closed-end funds do not sell their shares to the public in the ordinary course of business, there are methods available to them to raise new capital after their initial public offering. One such device is a "rights offering," by which a fund offers shareholders the opportunity to purchase newly issued shares. Rights so offered may be transferable, allowing the current shareholder to sell them in the open market, or non-transferable, requiring the current shareholder to use them him- or herself or lose their value when the rights expire. It was the Fund's employment of a non-transferable rights offering that generated the claims at issue on this appeal.
 
 
 4
 On June 6, 1996, the Fund announced that it would issue one "right" per outstanding share to every shareholder, and that every three rights would enable the shareholder to purchase one new share in the Fund. The subscription price per share was set at ninety percent of the lesser of (1) the average of the last reported sales price of a share of the Fund's common stock on the New York Stock Exchange on August 16, 1996, the date on which the rights expired, and the four business days preceding, and (2) the per-share net asset value at the close of business on August 16.
 
 
 5
 The plaintiff asserts that this sort of rights offering is coercive because it penalizes shareholders who do not participate. Under the Fund's pricing formula for its rights offering, the subscription price could not have been higher than ninety percent of the Fund's per-share net asset value. Thus, the introduction of new shares at a discount diluted the value of old shares. Because the rights could not be sold on the open market, a shareholder could avoid a consequent reduction in the value of his or her net equity position in the Fund only by purchasing new shares at the discounted price. This put pressure on every shareholder to "pony up" and purchase more shares, enabling the Fund to raise new capital and thereby increase its asset holdings. Such purchases would, in turn, have tended to increase the management fee paid to defendant BEA Associates, the Fund's investment advisor, because that fee is based on the Fund's total assets.
 
 
 6
 At the close of business on August 16, 1996, the last day of the rights offering, the closing market price for the Fund's shares was $12.38, and the Fund's per-share net asset value was $17.24. The Fund's shareholders purchased 70.3 percent of the new shares available at a subscription price set at $11.09 per share, ninety percent of the average closing price for the Fund on that and the preceding four days. Through the rights offering, the Fund raised $20.6 million in new capital, net of underwriting fees and other transaction costs.
 
 
 7
 On May 16, 1997, the plaintiff brought this action against the Fund's directors, senior officers, and investment advisor. The plaintiff's complaint includes three direct class-action claims on behalf of all shareholders.[2] It alleges that the defendants, by approving the rights offering, breached their duties of loyalty and care at common law and in violation of §§ 36(a) and 36(b) of the Investment Company Act, 15 U.S.C. §§ 80a-35(a), 80a-35(b). Compl. ¶ 32-37. The complaint further alleges that certain defendants violated § 48 of the ICA (15 U.S.C. §§ 80a-47) because of their positions of authority and control at the Fund. Id. ¶ 93-100. It asserts that these breaches of duty resulted in four kinds of injury to shareholders: (1) loss of share value resulting from the underwriting and other transaction costs associated with the rights offering; (2) downward pressure on share prices resulting from the supply of new shares; (3) downward pressure on share prices resulting from the offering of shares at a discount; and (4) injury resulting from coercion, in that "shareholders were forced to either invest additional monies in the Fund or suffer a substantial dilution." Id. ¶ 13.
 
 
 8
 On April 6, 1998, the district court dismissed the direct claims on the ground that the injuries alleged "applied to the shareholders as a whole." Strougo v. Bassini, 1 F.Supp.2d 268, 274 (S.D.N.Y.1998) ("Bassini"). Although the impact of the rights offering on any given shareholder depended on whether and to what extent that shareholder purchased new shares pursuant to the rights offering, the district court held that "so long as the defendants' action toward all shareholders was the same, and any disproportionate effect was the result of the various shareholders' responses to the action, the shareholders have no direct action." Id. at 275 (quoting Strougo v. Scudder, Stevens & Clark, Inc., 964 F.Supp. 783, 792 (S.D.N.Y.1997) (internal punctuation omitted) ("Scudder")).[3]
 
 
 9
 The district court entered judgment for the defendants on September 15, 2000. The plaintiff now appeals.
 
 DISCUSSION
 I. Standard of Review
 
 10
 We review de novo the district court's grant of the defendant's motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Levy v. Southbrook Int'l Invs., Ltd., 263 F.3d 10, 14 (2d Cir.2001). In ruling on a motion to dismiss, a court must construe in the plaintiff's favor all well-pleaded factual allegations in the complaint. Hack v. President & Fellows of Yale College, 237 F.3d 81, 88 (2d Cir.2000), cert. denied, ___ U.S. ___, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). Dismissal of the complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Harris v. City of New York, 186 F.3d 243, 250 (2d Cir.1999) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).
 
 II. Choice of Law
 
 11
 We meet at the threshold the question of which law, state or federal, should be the source of the rules we apply to decide the issue of "shareholder standing" — whether the plaintiff may bring direct claims against the defendants — presented by this appeal.[4] The parties do not dispute that Maryland law governs the plaintiff's common law claims: Maryland is the Fund's state of incorporation. But the defendants encourage us also to apply Maryland law to decide the shareholder-standing issue raised by the plaintiff's claims under the ICA. The plaintiff asks us instead to fashion a uniform federal law applicable to these claims.
 
 
 12
 Because the plaintiff's claims under the ICA involve federal causes of action, a legal rule that "impact[s] significantly upon the effectuation" of the plaintiff's suit must "be treated as raising federal questions." Burks v. Lasker, 441 U.S. 471, 477, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). Hence, our points of departure in the selection of rules of shareholder standing under the ICA are "the statute and the federal policy which it has adopted." Id. at 476, 99 S.Ct. 1831 (citation and internal quotation marks omitted). The ICA itself is silent on issues of shareholder standing. However, the Supreme Court has held that, as a general matter, courts should look to state law to "fill the interstices of federal remedial schemes" unless (1) the scheme in question "evidences a distinct need for nationwide legal standards"; (2) "express provisions in analogous [federal] statutory schemes embody congressional policy choices readily applicable to the matter at hand"; or (3) "application of the particular state law in question would frustrate specific objectives of the federal programs." Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (internal punctuation and citations omitted). The presumption that state-law rules apply is particularly strong in disputes involving the law of corporations, an area where "private parties have entered into legal relationships with the expectation that their rights and obligations would be governed by state-law standards." Id.
 
 
 13
 The specific question in Kamen was whether a court should look to state law to determine whether a plaintiff who has brought a derivative suit under the ICA can avail him- or herself of the "demand futility" exception to the general rule that a shareholder cannot proceed with a derivative suit unless the shareholder has first made a demand on the board of directors to cause the corporation to sue directly. The Supreme Court held that the law of the state of incorporation provides the rule of decision.
 
 
 14
 [W]here a gap in the federal securities laws must be bridged by a rule that bears on the allocation of governing powers within the corporation, federal courts should incorporate state law into federal common law unless the particular state law in question is inconsistent with the policies underlying the federal statute.
 
 
 15
 Id. at 108, 111 S.Ct. 1711 (emphasis deleted).
 
 
 16
 Every other court of which we are aware that has considered the question of shareholder standing under the ICA has concluded that the rule in Kamen controls and that state law applies. See Lapidus v. Hecht, 232 F.3d 679, 682 (9th Cir.2000) ("[We] rely upon state law to determine whether the plaintiffs' claims are direct or derivative."); Boland v. Engle, 113 F.3d 706, 715 (7th Cir.1997) (stating that federal courts should apply state corporation law in determining whether a claim under the ICA is direct or derivative); Marquit v. Dobson, No. 98 Civ. 9089(JSM), 2000 WL 4155, at *1, 1999 U.S. Dist. LEXIS 19964, at *2 (S.D.N.Y. Jan.3, 2000) (holding that Kamen compels the conclusion that "[u]nder the Investment Company Act, the law of the state in which the corporation is incorporated governs whether a claim is derivative or direct"), aff'd sub nom. Marquit v. Williams, 229 F.3d 1135 (2d Cir.2000) (table); Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 489 (N.D.Ill. 1999) (citing Kamen for the proposition that, for claims under the ICA, courts should generally look to the corporation law of the state where an investment company is incorporated); Scudder, 964 F.Supp. at 790 ("To determine whether a claim brought under the ICA is direct or derivative, a court must look to the law of the state in which the fund was incorporated.") (citing Kamen, 500 U.S. at 97-99, 111 S.Ct. 1711).
 
 
 17
 To be sure, a shareholder-standing question is not properly characterized as bearing on the "allocation of governing powers within the corporation," as was the issue in Kamen, 500 U.S. at 108, 111 S.Ct. 1711. The question is not who controls the litigation — the shareholder effectively controls the suit regardless of whether it is direct or derivative. But we read Kamen to hold more broadly that the ICA lacks sufficient indicia of Congressional intent for courts to fashion nationwide legal standards to overcome the presumption that state-law rules on questions of corporation law will be applied. See id. at 98-99, 111 S.Ct. 1711. And the plaintiff has not directed us to, nor have we ourselves found, "express provisions in analogous [federal] statutory schemes" that reflect "congressional policy choices" and that are "readily applicable to the matter at hand." Id. at 98, 111 S.Ct. 1711.
 
 
 18
 Our conclusion here follows from Kamen: We must fill a gap in the ICA with rules borrowed from state law unless, under the third Kamen exception, application of those rules would frustrate the specific federal policy objectives underlying the ICA. But we cannot determine whether borrowing state law would frustrate the objectives of the ICA until we have determined what the applicable state law of shareholder standing is. We will therefore return to this final piece of the choice-of-law puzzle after determining the rules of shareholder standing under Maryland corporation law and applying them to the facts as alleged in the plaintiff's complaint.
 
 III. Shareholder Standing under Maryland Law
 
 19
 
 A. Pursuit of Direct Claims for "Undifferentiated Harm" to All Shareholders
 
 
 
 20
 Waller v. Waller, 187 Md. 185, 49 A.2d 449 (1946), remains the leading Maryland case on shareholder standing. There, a shareholder brought a direct action against, inter alios, a corporation's sales manager alleging that he and others had caused injury to the shareholder through the improvident discharge of employees, diversion of customers to competitors, choice of detrimental pricing policies, embezzlement of corporate funds, and disruption of corporate governance activities. Id. at 189, 49 A.2d at 451-52. In ruling that the plaintiff's claims could not be brought in a direct shareholder suit, the Maryland Court of Appeals observed:
 
 
 21
 It is a general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock. The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation.
 
 
 22
 Id., 49 A.2d at 452. The Court of Appeals further explained:
 
 
 23
 The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each.
 
 
 24
 Id. at 189-90, 49 A.2d at 452. Thus, Waller noted that a direct action for injuries shared by the corporation may inequitably displace the claims of creditors and thereby subvert the creditors' priority. The court then determined that the injuries alleged by the plaintiff derived from injuries to the corporation itself, and thus the plaintiff lacked standing to bring direct claims. Id. at 191, 49 A.2d at 453.
 
 
 25
 Waller, in holding that a corporation and not its shareholders may recover for "injury to [its] property ... or ... impairment or destruction of its business," does not elaborate on the meaning of "property" or "business" for these purposes. It does hold, however, that these terms include not only the corporation's funds and inventory, but also its relationships with employees and customers and its internal processes for decision-making. Id. at 189, 49 A.2d at 451-52. More recently, the Maryland Court of Appeals held that injury to the corporation's business or property also occurs when officers and directors waste funds on perquisites, salaries, and bonuses, or make imprudent investments. O'Donnell v. Sardegna, 336 Md. 18, 24-28, 646 A.2d 398, 401-03 (1994). The Maryland Court of Special Appeals has further ruled that corporate business or property injury occurs if officers and directors mismanage or misappropriate funds. Tafflin v. Levitt, 92 Md.App. 375, 381, 608 A.2d 817, 820 (1992). And in Danielewicz v. Arnold, 137 Md.App. 601, 769 A.2d 274 (2001), the same court held that the corporation alone has standing when it issues an excessive number of shares in exchange for shares of another company, even if the issuance of those shares rendered the plaintiff, formerly a majority shareholder, a minority shareholder. The court found Waller to be indistinguishable. Danielewicz, 137 Md.App. at 621, 769 A.2d at 285-86. These Maryland cases indicate, inter alia, that ill-advised investments by a corporation, even if paid for with the corporation's shares, may constitute an impairment or destruction of the corporation's business.
 
 
 26
 In deciding whether a shareholder may bring a direct suit, the question the Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is "distinct" from that suffered by the corporation. Tafflin, 92 Md.App. at 381, 608 A.2d at 820.
 
 
 27
 Tafflin deals not with a shareholders' suit, but with the analogous situation of depositors in an insolvent savings and loan association seeking to recover for losses against the association's directors, officers, accountants, lawyers, and others. It is nonetheless illuminating because it explains, in comparable circumstances, the "distinct injury" requirement by reference to the concern expressed in Waller for making damages recovered for injury to the corporation available to pay the debts of the corporation.
 
 
 28
 Appellants' [alleged injuries] are not distinct from the injury sustained by [the bank] and all its depositors as a result of appellees' mismanagement and wrongdoing.... [P]ermitting depositors to bring individual actions for [mismanagement of funds] would invariably impair the rights of other general creditors and claimants with superior interests.... [T]hat ... fraud may have induced all of the depositors to make their original deposits does not justify bypassing this equitable and common-sense system for recovery.
 
 
 29
 Tafflin, 92 Md.App. at 381-82, 608 A.2d at 820 (internal citation omitted).
 
 
 30
 Both Waller and Tafflin acknowledge that harm to shareholders may flow from injuries to a corporation's business or property, including those that decrease the value of firm assets or otherwise impair the corporation's ability to generate profits. Maryland law nonetheless provides that in such circumstances, despite the harm to shareholders, the corporation alone has a cause of action to recover for the injury asserted. Although shareholders suffer collateral injury, they may have that injury redressed only through the collateral effect of the results of the corporation's lawsuit — which might, for instance, result in a recovery of damages by the corporation and thus a corresponding increase in share value.[5] Allowing shareholders to recover directly, on the other hand, besides threatening the "multiplicity of suits" cited by Waller, 187 Md. at 189, 49 A.2d at 452, makes possible recoveries that are inequitably distributed among those other than shareholders with an interest in the corporation. Specifically, if the corporation were in default on its debt, direct shareholder suits for corporate injury could defeat the prior claim of corporate creditors to corporate assets because the rule of limited liability would prevent the creditors from reaching damages recovered by the shareholders personally. Where shareholders suffer an injury that does not stem from an injury to the corporation's business or property, by contrast, the corporation lacks standing to sue, and Maryland's "distinct injury" rule allows shareholders access to the courts to seek compensation directly.
 
 
 31
 Thus, under Maryland law, when the shareholders of a corporation suffer an injury that is distinct from that of the corporation, the shareholders may bring direct suit for redress of that injury; there is shareholder standing. When the corporation is injured and the injury to its shareholders derives from that injury, however, only the corporation may bring suit; there is no shareholder standing. The shareholder may, at most, sue derivatively, seeking in effect to require the corporation to pursue a lawsuit to compensate for the injury to the corporation, and thereby ultimately redress the injury to the shareholders.
 
 
 32
 We thus reject the "undifferentiated effect on shareholders" standard, which the district court articulated in Scudder and relied upon in its decision in this case. See Bassini, 1 F.Supp.2d at 275 ("[S]o long as the defendants' action toward all shareholders was the same, and any disproportionate effect was the result of the various shareholders' responses to the action, the shareholders have no direct action.") (citing Scudder, 964 F.Supp. at 792). To sue directly under Maryland law, a shareholder must allege an injury distinct from an injury to the corporation, not from that of other shareholders.[6]
 
 
 33
 In Scudder, the district court ruled that shareholders cannot bring direct claims where the alleged injury involves "undifferentiated harm" that "falls equally on all shareholders." 964 F.Supp. at 790. Scudder in turn drew its "undifferentiated harm" rule from Olesh v. Dreyfus Corp., No. CV-94-1664 (CPS), 1995 WL 500491, 1995 U.S. Dist. LEXIS 21421 (E.D.N.Y. Aug.8, 1995), a case that applied Maryland law to shareholder claims arising from a merger. But the relied-upon language from Olesh, "complaints have been converted into derivative actions where the injury involved obviously `fell alike' on all... shareholders," id. at *7, 1995 U.S. Dist. LEXIS 21421 at *18, is descriptive rather than prescriptive. The Olesh court accurately observed that many cases where injury falls alike on all shareholders are properly brought as or become derivative actions. It is not true, however, and Olesh does not stand for the proposition, that if injury falls alike on all shareholders, legal action seeking redress for that injury may only be brought derivatively. Neither of the cases cited by Olesh as the source of its observation, moreover, relies upon Maryland law. And both involve alleged shareholder injuries deriving from diminution of corporate assets, an injury quintessentially remediable by shareholders only through a derivative action. See Vincel v. White Motor Corp., 521 F.2d 1113, 1118 (2d Cir.1975); Nordberg v. Lord, Day & Lord, 107 F.R.D. 692, 698 (S.D.N.Y.1985).
 
 
 34
 An inquiry that asks only whether shareholders have suffered "undifferentiated harm," rather than whether the shareholders have suffered injury distinct from any potential injury to the corporation, could lead to situations in which shareholders are improperly left with an injury without legal recourse. There may be acts that injure shareholders equally but do not injure the corporation at all; indeed they might be seen as benefitting the corporation in the sense that they might increase its assets. The shareholders, despite their undifferentiated harm, could not bring a derivative suit — nor could the corporation recover for them — because no such suit could succeed without a showing of injury to the corporation. In such circumstances, only a direct suit by shareholders can redress the harm to them, even though the harm was suffered by the shareholders equally. See James J. Hanks, Jr., Maryland Corporations Law § 7.21(b), 270 (1990 & 2000 Suppl.) ("If the wrong alleged was committed against the stockholder rather than the corporation, then the stockholder must bring the action as a direct action — either individually or as representative of a class — and not as a derivative action.") For this reason, the rule under Maryland law is that where shareholders suffer a distinct injury, i.e., an injury that does not derive from corporate injury, they may bring direct suit, even if their injury is undifferentiated among them.
 
 
 35
 
 B. Pursuit of Direct Claims for Breach of Fiduciary Duty
 
 
 
 36
 We also do not see a basis in Maryland law for the defendants' argument, premised on Scudder, that claims for alleged breaches of fiduciary duty by directors and officers only support derivative actions and may not be pursued directly. See Scudder, 964 F.Supp. at 792. It is not clear that this was essential to the decision in Scudder, inasmuch as it appears to have been stated as an observation rather than as a rule of law. Id. at 791 ("[C]laims of breach of duty by directors and other fiduciaries of a corporation generally are regarded as derivative rather than direct...."). But in any event, the defendants have asserted that under Maryland law, directors and officers cannot be sued directly by shareholders for alleged breaches of fiduciary duty. We disagree.
 
 
 37
 Maryland case law appears to be silent on the narrow question whether shareholders may bring fiduciary duty claims directly against officers and directors. Although neither the district court nor the defendants cite a case from a Maryland court that holds that such lawsuits are prohibited, the plaintiffs similarly fail to cite a case in which such a suit was allowed.
 
 
 38
 But Maryland courts have clearly established the proposition that directors and officers owe fiduciary duties to both the corporation and the shareholders. See Toner v. Baltimore Envelope Co., 304 Md. 256, 268-69, 498 A.2d 642, 648 (1985) (collecting cases); Waller, 187 Md. at 194, 49 A.2d at 454.[7] This means that by asserting that shareholders may not bring direct claims against directors and officers based on an alleged breach of fiduciary duties, the defendants in effect argue that these fiduciary duties, though extant, are non-actionable. The availability of a derivative action does not suggest otherwise. As we have seen, a derivative suit may only be brought if the plaintiff alleges injury to the corporation, and cannot be brought by a plaintiff who alleges only a distinct injury to him- or herself as the result of the breach of a fiduciary duty or otherwise. Thus, the availability of derivative actions does not give shareholders a remedy that they would not have if the officers and directors owed their fiduciary duties to the corporation alone.
 
 
 39
 We note that there is no dispute that the fiduciary duties owed by directors and officers to the corporation are actionable, as the existence of derivative actions under Maryland law indicates. Maryland law also makes clear that the fiduciary duties owed minority shareholders by majority shareholders are actionable, and may be enforced through direct claims. See, e.g. Baker v. Standard Lime & Stone Co., 203 Md. 270, 285, 100 A.2d 822, 830 (1953); Coop. Milk Serv. v. Hepner, 198 Md. 104, 114, 81 A.2d 219, 224 (1951) (dismissing claims on other grounds).
 
 
 40
 Thus, in order to adopt the defendants' argument, we would be required to reach two odd conclusions about Maryland law. We would first have to conclude that the repeated assertions by the Maryland courts of the existence of fiduciary duties flowing from directors and officers to shareholders were not meant to have practical import. See Toner, 304 Md. at 268-69, 498 A.2d at 648. And we also would be forced to conclude that Maryland courts intend the term "fiduciary duty" to have a different meaning with regard to the duty from directors and officers to shareholders — not giving rise to enforceable rights — than it does with regard to the duty from directors and officers to the corporation and also the duty from majority to minority shareholders — giving rise to enforceable rights — even where the courts use the term only once in a sentence to refer to both sets of relationships. See, e.g., Waller, 187 Md. at 194, 49 A.2d at 454. ("It is generally stated that directors occupy a fiduciary relation to the corporation and all its stockholders....") We are unaware of principles of interpretation that would support such a reading of the Maryland cases.
 
 IV. Plaintiff's Standing to Sue Directly
 
 41
 Applying Maryland's law of shareholder standing to the plaintiff's four alleged injuries, we conclude that one that he alleges does not support direct claims under Maryland law. The remaining alleged injuries, however — describing the set of harms arising from the alleged coercion — do.
 
 
 42
 The plaintiff alleges a loss in share value resulting from the "substantial underwriting and other transactional costs associated with the Rights Offering." Compl. ¶ 11. He effectively concedes in his reply brief, however, that this alleged injury cannot support direct claims under Maryland law, and we agree. Underwriter fees, advisory fees, and other transaction costs incurred by a corporation decrease share price primarily because they deplete the corporation's assets, precisely the type of injury to the corporation that can be redressed under Maryland law only through a suit brought on behalf of the corporation. See O'Donnell, 336 Md. at 28, 646 A.2d at 403.
 
 
 43
 The plaintiff's remaining alleged injuries can be read to describe the set of harms resulting from the coercive nature of the rights offering. The particular harm allegedly suffered by an individual shareholder as a result of the coercion depends on whether or not that shareholder participated in the rights offering. For example, when read in the light most favorable to the plaintiff, the alleged injury of "substantial downward pressure on the price of the Fund's shares" resulting from the issuance of new shares describes the reduction in the net equity value of the shares owned by non-participating shareholders. Compl. ¶ 9.[8] Similarly, the alleged injury from the downward pressure on share prices resulting from the setting of the "exercise price of the rights ... at a steep discount from the pre-[r]ights [o]ffering net asset value" can be read to refer to the involuntary dilution in equity value suffered by the non-participating shareholders. Compl. ¶ 10.[9]
 
 
 44
 Whether the participating shareholders also suffered harm to their assets, at least in terms of overall financial position, is not obvious, and the complaint is less specific in this regard. In terms of the dilution that resulted from the rights offering, the participating shareholders actually benefitted from the non-participating shareholder's injury, as the participating shareholders received the redistributed equity in the Fund. On the other hand, participating shareholders may have suffered harm in the form of transaction costs in liquidating other assets to purchase the new shares, and the impairment of their right to dispose of their assets as they prefer if they purchased new shares to avoid dilution.
 
 
 45
 While it is not clear to us that the injuries allegedly sustained by the participating shareholders are redressable, we leave that question for the district court to resolve in the first instance. It is clear, however, that the claims of the shareholders generally cannot be dismissed for failure to state a direct, as opposed to derivative, claim, as the district court did. The alleged injuries resulting from the coercive nature of the rights offering do not derive from a reduction in the value of the Fund's assets or any other injury to the Fund's business. Indeed, with reference to the shareholders that purchased new shares in order to avoid dilution, the acts that allegedly harmed the shareholders increased the Fund's assets. And as for the non-participating shareholders, the reduced value of their equity did not derive from a reduction in the value of the Fund's assets, but rather from a reallocation of equity value to those shareholders who did participate.
 
 
 46
 Thus, in the case of both the participating and non-participating shareholders, it would appear that the alleged injuries were to the shareholders alone and not to the Fund. These harms therefore constitute "distinct" injuries supporting direct shareholder claims under Maryland law. The corporation cannot bring the action seeking compensation for these injuries because they were suffered by its shareholders, not itself.[10]
 
 
 47
 In deciding that the plaintiff has shareholder standing to bring direct claims for the injuries arising from coercion based on the allegations in his complaint, we do not express or intend to imply any view with respect to the merits of those claims. Indeed, we cannot tell from the complaint whether the plaintiff is a participating or non-participating shareholder, and thus the sort of injury for which he personally seeks a remedy. We therefore do not express a view as to which groups of shareholders the plaintiff might suitably represent or the redressibility of their claims, i.e., whether, if a breach of the duty running from the defendants to the shareholders is proven, a remedy in law or in equity may be fashioned that will fairly and appropriately redress the distinct types of injuries suffered by them. We leave this all to the district court on remand.
 
 V. Choice of Law Redux
 
 48
 We return, then, to the question with which we began: Which law, state or federal, should provide the rule of decision in this case? We concluded in Part IV, above, that three of the plaintiff's alleged injuries, the set of harms arising from the alleged coercion of the rights offering, supports direct claims under Maryland law. The plaintiff is therefore able to bring direct claims under the ICA for such injury unless we determine that application of Maryland's law of shareholder standing would frustrate the specific federal policy objectives underlying the ICA.
 
 
 49
 Our investigation of policy objectives is hampered by the fact that §§ 36(a), 36(b), and 48 of the ICA do not explicitly provide for direct causes of action by private individuals. This makes the presumption that rules will be borrowed from state law to determine questions raised by the plaintiff's ICA claims all the more difficult to overcome. The expectations of private parties that state law will govern their corporate disputes is even higher when the federal statute invoked does not on its face provide notice to the parties of a possibility of a federal private suit and thereby suggest that federal law may be applied.
 
 
 50
 Lacking meaningful indications of congressional policy regarding the plaintiff's specific causes of action, we turn to the general policy statement of the ICA set out in ICA § 1(b), 15 U.S.C. § 80a-1(b). Relevant objectives of the statute listed there include protecting all classes of investment company security holders from the special interests of directors, officers, and particular classes of security holders, and preventing investment companies from failing to protect "the preferences and privileges of the holders of their outstanding securities." Id. § 80a-1(b)(3). We conclude as a general matter that Maryland's law of shareholder standing, with its emphasis on honoring the expectations and protecting the interests of both shareholders and corporate creditors, appears to support the policy goal of protecting all classes of security holders. And the potential availability of direct action to redress coercive practices by directors and officers (assuming that these practices breach the directors' and officers' fiduciary duties — a question we do not decide here) appears to protect the preferences of shareholders who do not wish to increase their investments in a closed-end fund. We thus see nothing in the general policies of the ICA that would militate against importing Maryland's rules of shareholder standing for claims brought for alleged violations of the ICA sections cited by the plaintiff.
 
 
 51
 We hold that the plaintiff's alleged injuries associated with coercion support direct claims under both Maryland law and, in this case, §§ 36(a), 36(b), and 48 of the ICA.
 
 CONCLUSION
 
 52
 For the foregoing reasons, the judgment of the district court is vacated insofar as it dismisses the plaintiff's class action claims. The case is remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The district court also dismissed derivative claims brought by the plaintiffSee Strougo v. Bassini, 112 F.Supp.2d 355 (S.D.N.Y.2000). No appeal was taken from that ruling.
 
 
 [2]
 It also contains three derivative claims on behalf of the Fund that are not the subject of this appeal
 
 
 [3]
 On September 8, 2000, the district court dismissed the plaintiff's remaining, derivative claimsStrougo v. Bassini, 112 F.Supp.2d 355, 369 (S.D.N.Y.2000). The court based its decision in part on the recommendation of a special litigation committee created under a consent agreement by the Fund's board of directors, and in part on its determination, applying its own business judgment, that continuing the derivative action would not benefit the Fund. Id. at 359-60, 369.
 
 
 [4]
 "Shareholder standing" is a term used to describe the ability of a shareholder to seek redress for certain injuries on his or her own behalf rather than on behalf of the corporationSee Audio Odyssey, Ltd. v. Brenton First Nat'l Bank, 245 F.3d 721, 729 (8th Cir.), vacated on other grounds, 245 F.3d 721 (8th Cir.2001) (in banc); see also Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir.) ("[D]iminution in value of the corporate assets is insufficient direct harm to give the shareholder standing to sue in his own right.") (citation and internal quotation marks omitted), cert. denied, 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986).
 
 
 [5]
 Maryland law thus places corporate shareholders on the same footing as those other persons with an interest in a business, such as employees, officers, and creditors, who might suffer collateral harm when the business is injured, but who normally lack standing to bring suit to seek redress for that injury
 
 
 [6]
 For this reason we disagree with the reasoning of the decisions inKing v. Douglass, 973 F. Supp. 707 (S.D.Tex.1996), and In re Nuveen Fund Litig., 855 F.Supp. 950 (N.D.Ill.1994), two cases relied upon by the district court in Scudder and urged upon us by the defendants, see Scudder, 964 F.Supp. 783, 791-92, at least as applied to actions governed by Maryland law. In both cases, the courts ruled that claims against investment fund officers and directors could not be brought in a direct action by shareholders because the state law which they were applying would not permit shareholders to bring direct claims involving "undifferentiated harm" that falls equally on all shareholders. In King, the court concluded that Delaware law requires a shareholder to allege an injury "separate and distinct from that to other shareholders" in order to bring a direct claim. 973 F.Supp. at 716 (emphasis added). Similarly, the court in Nuveen decided that the shareholders lacked standing to sue directly under Minnesota law because the alleged "injury to each shareholder [was] of the same character." 855 F.Supp. at 954 (internal quotation marks omitted). Because we do not find support for such an "undifferentiated harm" rule in Maryland law, we conclude that, even if the cases were correctly decided under Delaware and Minnesota law, their reasoning is inapplicable here.
 
 
 [7]
 Waller places a limit on this fiduciary duty to shareholders, holding that "directors occupy a fiduciary relation to the corporation and all of its stockholders, but they are not trustees for the individual stockholders." 187 Md. at 194, 49 A.2d at 454. The effect of this holding was to deny an attempt by an individual shareholder to enforce through a direct claim a contractual obligation owed to the corporation by an officer. The Maryland Court of Appeals reasoned that because a corporation does not hold its rights and assets in trust for its shareholders, but rather as a distinct legal person, it is the corporation rather than the shareholder that has standing to enforce those rights and duties. "The reason for this distinction is that in law the corporation has a separate existence as a distinct person, in which all corporate property is vested and to which the directors are responsible for a strict and faithful discharge of their duty...." Id.
 As indicated in the next section, the plaintiff's alleged injury of coercion in this case is not based on alleged harm to the Fund's assets or on an alleged breach of a contractual duty to the Fund, and so direct claims based upon that injury are not founded upon the existence of a duty to the plaintiff from the defendants as trustees.
 
 
 [8]
 The actual allegation in the complaint is that the rights offering "substantially increase[d] the supply of a limited commodity — a U.S. based vehicle for investing in Brazil — relative to existing demand." Compl. ¶ 4. Although not free from doubt, the "vehicle" appears to be the Fund's shares. We note that this allegation only describes an actual injury if read, as we read it here, to refer not to the effect of a reduction in share prices on shareholders generally, but rather to the loss in value of the equity positions of the non-participating shareholders. The plaintiff's interest as a shareholder is not in a share priceper se, but rather in the overall value of his equity — the share price multiplied by the number of shares owned. In a familiar setting, when shares of stock in a corporation are split two for one, immediately after the split each share of stock is worth half of what it was worth immediately before the split. But the total value of each shareholder's equity interest would not be expected to fall and thereby injure the shareholder because the decrease in share value is offset by the receipt of new shares. Thus, a mere increase in the number of shares, and a corresponding adjustment in share price, does not automatically constitute a shareholder injury. See, e.g., Baker, 203 Md. at 282, 100 A.2d at 828 (holding that a "split up of the common stock, by the issuance of four shares for one, did not adversely affect the holders, for after that action their aliquot shares remained the same").
 
 
 [9]
 Like the plaintiff's "vehicle" allegation, this assertion states an injury only when read in context. As noted, a stock split, in which each shareholder obtains new shares for nothing, can be recharacterized as a sale of shares to the shareholders at the deepest possible discount — 100 percent — and yet it does not in itself injure either the shareholders or the corporationBaker, 203 Md. at 282, 100 A.2d at 828.
 
 
 [10]
 The defendants countered at oral argument that the shares themselves are assets of the Fund, and thus that the sale of shares at a discount constitutes an injury to the corporation. We disagree. A corporation, as the plaintiff correctly argued, cannot have an equity interest in itself. As reflected on corporate balance sheets, equity is not an asset to the corporation, but indeed its opposite: aclaim on assets. A share of stock is no more an asset to its issuing corporation than a claim check is an asset to its issuing dry cleaner. Thus, by way of illustration, if one of the shareholders of a corporation that has four 25% shareholders were to donate all her shares to the corporation, the overall value of the corporation's assets would not increase. Instead, the percentage and therefore value of each of the other shareholders' stake in the equity of the corporation would increase from 25% to 33%.