OPINION OF THE COURT
Charles Edward Ramos, J.
This dispute arises out of the proposed merger between the New York Stock Exchange, Inc. (NYSE) and Archipelago Holdings, LLC.
In sustaining plaintiffs’ direct shareholder class action complaints challenging the fairness of the merger that was allegedly tainted by numerous conflicts of interest and for an unfair price, this court is applying a merits-based analysis, akin to Delaware’s approach to reviewing shareholder challenges to mergers.
In motion sequence No. 004, filed under index number 601646/05, defendant Goldman Sachs Group, Inc. moves to dismiss the complaint pursuant to CPLR 3016 (b) and 3211 (a) (7). In motion sequence No. 005 of the same index number, defendants NYSE, John Thain, Marshall N. Carter, Herbert M. Allison, Jr., Ellyn L. Brown, Shirley A. Jackson, James S. McDonald, Alice M. Rivlin, Robert B. Shapiro, Karl M. von der Heyden, Dennis Weatherstone, and Edgar Woolard, Jr. (collec *259 lively, NYSE defendants) move to dismiss the complaint, pursuant to CPLR 3211 (a) (3) and 3211 (a) (7).
In a related action filed under index number 106717/05, in motion sequence No. 002, Goldman moves to dismiss the complaint, pursuant to CPLR 3016 (b) and 3211 (a) (7).
These two actions, Caldwell v New York Stock Exchange, Inc. and Higgins v New York Stock Exchange, Inc., have recently been consolidated and now bear the caption In re New York Stock Exchange I Archipelago Merger Litigation, index number 601646/05.
Background
The facts set forth below are taken from the allegations of the Higgins and Caldwell complaints unless otherwise indicated.
The NYSE, affectionately termed the “Big Board” throughout its lengthy 212-year history, is the world’s largest equities market, where an average of approximately 1.4 billion shares are traded in a single day. As a not-for-profit entity incorporated in New York, NYSE members hold seats rather than shares in the corporation. Seatholders are entitled to physical access to the NYSE trading floor. The NYSE is comprised of 1,366 seats altogether. Plaintiffs Higgins, Caldwell, Joselson and Horn (collectively, plaintiffs) are “seatholders” in the NYSE.
The NYSE defendants comprise the 11 members of the NYSE Board of Directors (Board), led by Chief Executive Officer (CEO) Thain. Prior to assuming the position of CEO of the NYSE in early 2004, Thain held various executive positions in defendant Goldman since 1994, including the positions of president, CEO, co-CEO, and chief financial officer (CFO). Further, Thain owns in excess of 2.2 million shares of Goldman stock, worth an estimated $225 million.
Defendant Archipelago,[1] the predecessor of “ArcaEx” as it is known today, was founded in late 1996 as a fully automated, electronic stock market, one of the few existing in the world today. Unlike the NYSE, in which brokers physically buy, sell and trade equities in an auction-based market on the trading floor, all trading at Archipelago is conducted on-line through an automated electronic system. In this capacity, Archipelago is a direct competitor of the NYSE.
*260 Plaintiffs allege that, since Archipelago’s creation, defendant Goldman has heavily invested in it and its subsidiaries, a strategy backed by current Goldman chairman and CEO, and former NYSE Board member and NYSE Board of Executives (executives) member, Henry Paulson. At one point Goldman was Archipelago’s largest shareholder, owning upward of 24%; today that ownership interest stands at approximately 15.6%.[2] Plaintiffs additionally allege that aside from providing substantial investment capital to Archipelago over the years, Goldman served as the lead underwriter for Archipelago’s initial public offering (IPO) in 2004, earning over $1.7 million in investment banking fees.
The Proposed Merger
Prior to Richard Grasso’s resignation as chairman of the NYSE in 2003, plaintiffs allege that many key players on Wall Street, including Thain, Goldman, Merrill Lynch & Co. and JP Morgan & Co., began urging the NYSE to increase automated trading at the NYSE, in addition to converting the NYSE’s not-for-profit status into a public, for-profit corporation, thus expanding the NYSE’s competitiveness and value. According to plaintiffs, as soon as Thain assumed the position of NYSE chairman, he began developing a plan to fulfill these goals.
On April 20, 2005, NYSE and Archipelago announced that the corporations will combine pursuant to a merger agreement. Under the merger agreement, the NYSE will merge into a newly created for-profit Delaware corporation (merger sub), upon which the NYSE will cease to exist. Each NYSE ownership interest will then convert into the right to receive $300,000 in cash and one share of the merger sub.[3] Archipelago and the merger sub will then merge into a newly created for-profit corporation, called the NYSE Group, Inc. (Holdco), and each share of the merger sub will automatically convert into the right to receive one share of Holdco common stock. A vote on the merger is expected to take place in November 2005.
According to plaintiffs, the proposed merger unfairly withholds from the NYSE seatholders an appropriate distribution of shareholders’ equity, forcing them to relinquish their seats in the NYSE in exchange for an inadequate amount of shares in Holdco, shares which are unreasonably burdened by lock-up *261 provisions. Moreover, the allocation scheme pursuant to the merger agreement drastically undervalues the NYSE while overvaluing Archipelago shares, providing a financial “windfall” to former Archipelago shareholders. The alleged inequities of the merger agreement and disparate treatment of NYSE seatholders are allegedly apparent in several key provisions.
The 70/30 Allocation
Under the merger agreement, former NYSE seatholders will be allocated 70% of the aggregate amount of Holdco common stock, whereas former Archipelago shareholders will receive the remaining 30% of Holdco’s outstanding common stock. Plaintiffs allege that this allocation is patently unfair to NYSE seatholders because it does not accurately reflect the equity value of the NYSE, which will remain at over $575,000,000 in cash and its equivalent following the payout of $300,000 to each NYSE seatholder.
In contrast to the 70% allocation of Holdco common stock that the NYSE shareholders will receive under the merger, plaintiffs allege that NYSE seatholders are more appropriately entitled to an aggregate equity ownership closer to 90% of the merged corporation.
The “Lock-Up” Provisions
Under the so-called “lock-up” provision of the merger agreement, NYSE seatholders are precluded from selling their Holdco shares for up to five years, whereas currently NYSE seats are freely transferrable. In contrast, only certain of Archipelago shareholders, representing 40% of Archipelago’s shares, including Goldman, are subject to a similar lock-up provision. Plaintiffs allege, however, that Goldman separately negotiated “Demand Rights” which enables it to demand the release of “lock-up” restrictions on certain of their shares, rights which are not granted to NYSE seatholders.
The Five Percent Hold Back for Distribution to NYSE Employees
The agreement also includes a provision that allocates shares of up to five percent of the merged company to certain NYSE employees, including nonseatholders. Plaintiffs allege that this distribution of NYSE equity, representing close to $150 million, is improperly reducing the amount of shares in the merged corporation that the seatholders are entitled to.
Conflicts of Interest
In addition to challenging the fairness of the merger agreement itself, plaintiffs challenge the manner in which the merger *262 was negotiated. Plaintiffs maintain that CEO Thain was self-interested in the merger, given his substantial relations with Goldman, and ensured that Archipelago received the most favorable terms under the merger, including the 70/30 allocation scheme, which results in a “windfall” for Archipelago shareholders, for the ultimate benefit of Goldman and himself, as a large Goldman shareholder. Plaintiffs further allege that Goldman was also conflicted, given its substantial relations with Archipelago, and, further, improperly provided investment banking services to both Archipelago and the NYSE in the same transaction, earning millions of dollars in fees, including a total of $7 million in advisory fees. Goldman does not dispute that it was retained by both the NYSE and Archipelago to act as a “facilitator” in exploring a potential combination between the entities, in addition to providing various financial services, including valuations of both corporations, pursuant to an engagement letter executed on February 10, 2005. Plaintiffs further allege that the engagement letter reveals the extent of the conflicts of interest that Goldman was operating under by providing both entities with financial services for the merger.
The decision to retain Goldman to advise NYSE in the merger was approved by the Board and by CEO Thain, who allegedly refused to recuse himself from the decision to retain Goldman to advise the NYSE in the merger, despite his close ties to Goldman and his fiduciary duties to the NYSE, which prohibits directors from deliberating in a matter in which they are personally interested, although Thain did recuse himself from the vote on Goldman’s compensation for providing these services.
Plaintiffs allege that Thain and Goldman dominated the remaining Board members such that they were incapable of independence. Plaintiffs additionally challenge the Board members’ interestedness due to their own business and employment relations with Goldman, and other large financial institutions with large stakes in Archipelago. Plaintiffs’ complaint reveals that the majority of the Board members, Allison,[4] Weatherstone,[5] *263 Shapiro,[6] Woolard,[7] Carter,[8] von der Heyden,[9] McDonald,[10] Rivlin,[11] and Jackson[12] do indeed have some degree of relations to Goldman that casts doubt on their ability to place the NYSE’s interests above that of Goldman’s financial interests.
Moreover, plaintiffs allege that the “independent” fairness opinion rendered by hazard Freres just two weeks prior to the execution of the merger agreement itself was inherently flawed, hazard was allegedly also incapable of independence due to its relations with Goldman. At the time hazard was retained, Goldman was underwriting hazard’s IPO, which was completed in the midst of hazard’s preparation of its fairness opinion on the merger. The details of hazard and Goldman’s relations was allegedly never disclosed to the NYSE Board. Moreover, the law firm of Wachtell, hipton, Rosen & Katz, counsel for NYSE, whom NYSE management retained to review and revise the draft merger agreement, was also representing hazard in its IPO. Moreover, the fairness opinion itself was allegedly rife with omissions and miscalculations.
In May of 2005, plaintiffs commenced this suit as a class action comprised of NYSE seatholders, asserting causes of action against Thain and the NYSE Board alleging breach of the fiduciary duty of loyalty, due care and good faith, and for aiding and abetting breach of fiduciary duty against Goldman and Archi *264 pelago. Plaintiffs ultimately seek injunctive relief enjoining the proposed merger and monetary damages.[13]
Discussion
A. Lack of Capacity to Sue Directly
1. Undifferentiated Harm
The NYSE defendants argue that the complaints state only derivative claims, and thus plaintiffs lack standing to pursue this action directly under CPLR 3211 (a) (3). Defendants maintain that because plaintiffs lack standing to bring a direct action, and have otherwise failed to comply with the prerequisites of bringing a derivative action under Not-For-Profit Corporation Law § 623 (a) by demonstrating that they represent five percent of the NYSE membership and have neither made a demand on the NYSE Board to pursue the claims, nor provided justification for failure to make such a demand, plaintiffs actions must be dismissed. In contrast, plaintiffs argue that the Higgins and Caldwell complaints properly state direct causes of action against NYSE Board members, and thus are viable.
Under New York law,[14] a shareholder lacks standing to pursue a direct cause of action to redress wrongs suffered by the corporation; rather, such claims must be asserted derivatively, for the benefit of the corporation. (Abrams v Donati, 66 NY2d 951, 953 [1985], rearg denied 67 NY2d 758 [1986].) A significant and logical exception to this rule has been carved out, however, allowing for direct claims to be asserted against a corporation where the shareholder alleges breach of a duty owed independent of any duty owed to the corporation. (Abrams, 66 NY2d at 953.) The ability to distinguish between direct and derivative claims has often been problematic for courts undertaking the analysis, and the parties sharply dispute the proper standard the court should apply. Rather than distinguishing between who suffered the alleged harm to determine whether the claim is properly asserted as direct or derivative, defendants maintain that where, as here, shareholders allege breach of fi *265 duciary duty by a board in the context of approving a merger in which the shareholders’ alleged harm is shared equally amongst them, the action is patently derivative in nature.
Thus, according to defendants, the court’s initial inquiry should be to determine if the harm alleged by plaintiffs affects all NYSE shareholders proportionately, and if so, the action is derivative and the requirements of Not-For-Profit Corporation Law § 623 (a) must be met. Defendants’ insistence on the demonstration of differentiated harm as a threshold to maintaining a direct shareholder action against a corporation may leave some plaintiffs without legal redress for their injuries, however.
In the event that plaintiffs allege harm flowing to shareholders that is distinct from any wrong suffered by the corporation, as plaintiffs here allege, applying, as defendants urge, the requirement of “differentiated harm” necessarily precludes those plaintiffs from asserting a direct claim, merely because the alleged breach harms all shareholders equally. However, because such plaintiffs allege a harm distinct from that suffered by the corporation, they are additionally barred from asserting a derivative action, maintenance of which necessarily requires allegations of a corporate, as opposed to an individual harm. Consequently, plaintiff shareholders alleging proportionate harm that does not otherwise implicate harm to the corporation, such that a derivative action will not lie, are necessarily left without a legal remedy to redress their injuries.
Recognition of the consequences of requiring differentiated harm as a threshold for a direct shareholder action has led several jurisdictions to expressly reject the concept that “undifferentiated harm” renders a direct claim fatal. In Strougo v Bassini (282 F3d 162 [2002]), the Second Circuit, while applying Maryland law, rejected “undifferentiated harm” as a basis for denying a direct shareholder suit, stating, “An inquiry that asks only whether shareholders have suffered ‘undifferentiated harm,’ rather than whether the shareholders have suffered injury distinct from any potential injury to the corporation, could lead to situations in which shareholders are improperly left with an injury without proper legal recourse.” (Strougo, 282 F3d at 172.) Moreover, Delaware courts have similarly dispensed with the requirement of differentiated harm. (See Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1038-1039 [Del Sup Ct 2004].)
While never explicitly rejecting the “undifferentiated harm” inquiry, New York courts have implicitly dispensed with the *266 requirement on occasion, allowing shareholders to maintain direct class action suits, which necessarily requires a finding of common issues of law and fact, and presumably, undifferentiated harm, as among shareholder class members. (See Matter of Colt Indus. Shareholder Litig., 77 NY2d 185 [1991] [Court of Appeals considered the right of a Missouri corporation to opt out of a New York class action, consolidating 15 direct shareholder suits arising out of a merger between two corporations].) While no analysis of the divide between direct-derivative actions was undertaken in Colt Indus., in holding that there is no due process right to opt out of a mandatory class that seeks equitable relief, the Court necessarily found that the prerequisites to bringing a class action existed, including the existence of common issues of law and fact as between shareholder class members. (Matter of Colt Indus., 77 NY2d at 195.) Accordingly, the proper inquiry in distinguishing between a direct and derivative claim is what is the nature of the harm alleged and who is principally harmed: the corporation or the individual shareholders.
Delaware courts additionally consider to whom the relief, if any, should go in the event that plaintiffs succeed.[15] (See Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1038-1039 [Del Sup Ct 2004].) Accordingly, under Tooley, if the court concludes that there is no injury to the corporation and thus there is no relief due and owing it, there is no basis for a finding that the complaint states a derivative claim. The court finds this extra step particularly instructive in the harm inquiry described at length below.
2. The Distinction Between Direct and Derivative Claims
Despite the oftentimes problematic distinction between direct and derivative claims, however, New York courts have consistently held that diminution in the value of shares is quintessentially a derivative claim. (Paradiso & DiMenna, Inc. v DiMenna, 232 AD2d 257, 258 [1st Dept 1996].) While a decrease in share value is undoubtedly harmful to the individual shareholder, this harm is said to derive from the harm suffered principally by the corporation and only collaterally to shareholders, and thus is derivative in nature. (Paradiso & DiMenna, Inc., 232 AD2d at 258.)
*267 Further, claims alleging waste and mismanagement on the part of the board of directors (Sook Hi Lee v 401-403 57th St. Realty Corp., 306 AD2d 108, 109 [1st Dept 2003]), and damage to a corporation’s name, reputation and associated goodwill due to the corporation’s chairman and CEO’s part in an insider trading scandal (Hahn v Stewart, 5 AD3d 285 [1st Dept 2004]), are additionally derivative in nature. Moreover, diversion of a corporate opportunity gives rise to a derivative action only. 0Glenn v Hoteltron Sys., 74 NY2d 386, 393 [1989].)
Many cases have analyzed the distinction between direct and derivative claims specifically in the context of challenges to mergers and other change of control transactions. In Fischbein v Beitzel, shareholders challenged the acquisition of Banker’s Trust by Deutsche Bank on the ground that the acquisition price was unfairly depressed at the shareholders’ expense due to excessive compensation and bonus arrangements provided by the acquired bank to certain bank directors and employees. (Fischbein v Beitzel, 281 AD2d 167 [1st Dept 2001], lv denied 96 NY2d 715 [2001].) While not identifying the specific nature of the harm, the First Department upheld this court’s dismissal of the plaintiff shareholder’s direct claims for lack of standing. (Fischbein, 281 AD2d at 167.)
Moreover, Delaware courts have sustained direct claims by shareholders where the complaint attacks the fairness of the merger itself due to unfair price and/or unfair process, the principal recognized in Kramer v Western Pac. Indus. (546 A2d 348, 354 [Del Sup Ct 1988]; see Pames v Bally Entertainment Corp., 722 A2d 1243 [Del Sup Ct 1999]). At issue in Kramer was whether the former shareholder of a corporation, who had been cashed out in a merger, had standing in his capacity as a former shareholder to pursue a breach of fiduciary claim against management. (Kramer, 546 A2d at 349.) In holding that a former shareholder does have standing to litigate claims of breach of duty arising from the merger, the court stated, “direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give complaining shareholders standing to pursue individual actions even after they are cashed-out through the effectuation of a merger.” (Id. at 354.) Specifically at issue in Kramer, however, is the legal limbo former shareholders find themselves in subsequent to being cashed out, as in addition to losing their equity interest in the corporation, they consequently lose their standing to sue the corporation in the capacity of a shareholder.
*268 The Kramer court analogized the situation of a former shareholder who has been cashed out and subsequently asserts a claim for breach of duty on the part of management, to a property owner who is suing for loss of property. (Id.) The court noted, “No one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of that property.” (Id.) In finding that the plaintiff’s claims were derivative in nature because the claims were ultimately alleging corporate mismanagement resulting in waste and otherwise did not allege that the merger price was unfair or that it was obtained through unfair dealing, the court upheld the grant of summary judgment dismissing the complaint, as the plaintiff, “having ceased to be a shareholder . . . , lacks standing to pursue the derivative claims asserted by his . . . complaint.” (Id. at 349.) Whether or not plaintiffs have standing to sue in their capacities as shareholders is not at issue here; it is indisputable that plaintiffs here have standing, as shareholders, to sue. Rather, the issue here is what is the nature of the harm alleged: direct or derivative.
Interestingly, Kramer’s progeny have caused an enormous amount of confusion among courts attempting to distinguish direct and derivative claims under Delaware law, however, as subsequent decisions citing to Kramer seem to be dispensing with the distinction altogether, despite their assertions otherwise, while expanding Kramer’s applicability beyond cash-out mergers. (See Pames v Bally Entertainment Corp., 722 A2d 1243 [Del Sup Ct 1999].) In Parnés, the court extended Kramer to a stock-for-stock merger, where the issue of shareholder standing was necessarily not implicated because the plaintiff was, simply put, still a shareholder. (Parnés, 722 A2d at 1244.) Parnés reversed a lower court’s dismissal of a class action complaint directly challenging the fairness of a merger, finding that the plaintiff could pursue direct claims against management for directly challenging the fairness of the process, via allegations of CEO dominance and lack of board independence, and for unfair price in the merger, citing to Kramer. (Id. at 1245-1246.)
Subsequent to Pames, in Agostino, the court acknowledged that, in sustaining direct claims that directly attack the fairness of a merger, the distinction between direct and derivative claims was necessarily collapsing: “It is unclear why a ‘direct’ challenge to a merger price is ipso facto a ‘direct’ claim.” (Agostino *269 v Hicks, 845 A2d 1110, 1119 n 35 [Del Ch 2004].) The Agostino court squared Parnés by recognizing that post -Kramer courts, in allowing direct claims to go forward where the complaint directly attacked the merger, are moving to a merits-based analysis in distinguishing direct and derivative claims. (Agostino, 845 A2d at 1120-1122.) The court went on to articulate its own inquiry to distinguish the claims: whether the harm alleged to the shareholder is dependent on a prior harm to the corporation. (Id.)
Finally, the most recent case to take Agostino’s lead in applying a merits-based analysis to the distinction between direct and derivative claims is in Tooley, mentioned above.[16] Further extrapolating on Agostino, Tooley articulated its own inquiry, since dubbed the “Tooley test.”[17] Under Tooley, the court should consider “(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).” (Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1033 [Del Sup Ct 2004].) The court went on to describe how a prior decision involving this issue would have been resolved under its own test. (Tooley, 845 A2d at 1037-1038.) The court finds the Tooley test to be the most instructive in isolating what lies at the core of the distinction between direct and derivative claims: the nature of the harm alleged.
At first glance, it appears that the First Department has only narrowly adopted the Kramer approach, finding shareholder standing based on claims of unfair price and unfair dealing where shareholders are cashed out in an acquisition undertaken at an unfairly low price and marred by breaches of fiduciary duty. (Bernstein v Kelso & Co., 231 AD2d 314, 322-323 [1st Dept 1997].) The Bernstein plaintiffs sought to recover the difference between the price received for the sale of the corporation in the cash out and the price that would have been received but for management’s breaches of fiduciary duty and misrepresentations. (Id.) In finding that plaintiffs had standing to sue directly, *270 the Bernstein court cited Kramer for the principle that alleging unfair dealing and unfair price was a proper basis for maintaining a direct shareholder claim, while narrowing its holding to cash-out mergers. (Id.)
While at issue in Bernstein was, in part, a similar dilemma to the plaintiff in Kramer, capacity to sue as a shareholder subsequent to losing shareholder status,[18] examining the case with the illustrative Tooley test sheds an enormous amount of light into the direction of New York law on this issue. Therefore, in the same vein as Tooley applied its own test to a prior decision on the issue of direct versus derivative standing to determine how it would be resolved,[19] applying the Tooley test, in turn, to Bernstein is particularly informative to the issues peculiarly raised in this action.
In Bernstein, the Court determined that management’s alleged scheme to sell the corporation at a depressed price via a cash-out merger resulted in an unfairly low payout of shareholders’ equity to the plaintiff.[20] Thus, under Tooley, the ultimate harm suffered by the plaintiff was that he received too little cash for his shareholders’ equity in the process of being cashed out. In contrast, the corporation who cashed out the plaintiff was not harmed, but was arguably benefitted, albeit improperly, because the benefit was allegedly obtained through a breach of duty. The element that distinguishes the harm flowing in the first instance to the plaintiff, rather than the corporation, is that the plaintiffs interests were at odds with the corporation’s interests: in paying the plaintiff less for his shares, more equity remained on the corporation’s balance sheet, translating into the appearance of more corporate assets.
Although the Bernstein court did not characterize the harm to plaintiff in these terms, the Tooley test informs us as to what is really at issue in these claims, however unarticulated these issues may be in subsequent New York and Delaware cases. Since Bernstein, however, the First Department has yet to consider whether direct shareholder claims, stated as they are here by plaintiffs, alleging harm from the unfair allocation and payout of shareholders’ equity in a merger are sufficiently distinct from corporate harm to withstand dismissal under *271 CPLR 3211 (a) (3) for lack of standing, since Bernstein. (But see Yatter v William Morris Agency, 256 AD2d 260, 260 [1st Dept 1998] [shareholder standing found where plaintiff asserted a direct cause of action for alleged intentional undervaluation of shares for the purpose of repurchase by the corporation, pursuant to an employment agreement].)
3. Plaintiffs’ Complaints
Turning now to the allegations of plaintiffs’ complaints, plaintiffs maintain that the NYSE defendants’ breach of fiduciary duty causes injury to shareholders’ equity interests under several provisions of the merger agreement. Plaintiffs maintain that this injury distinctly harms the seatholders, the NYSE’s equity holders, while actually benefitting the NYSE and the merged corporation. Therefore, plaintiffs maintain, because the injury alleged is not a harm to the corporation but rather a distinct harm to seatholders, the claims can be asserted directly.
According to plaintiffs, the payout of $300,000 and the granting of one share of Holdco common stock in exchange for members’ seats depletes approximately $40,000,000 of NYSE shareholders’ equity. Plaintiffs maintain that subsequent to this equity payout, over $575,000,000 in equity remains on the NYSE balance sheet, equity which will then be transferred to the merged corporation, a tangible benefit to both the NYSE, Archipelago and the merged corporation, as more assets will appear on the balance sheet of the merged corporation.[21] Plaintiffs maintain that the only class of interests harmed by the failure to allocate a larger portion of equity to NYSE seatholders is the seatholders themselves.
Additionally, plaintiffs argue that granting only one share of Holdco stock to seatholders drastically discounts the value of a NYSE seat. Moreover, while the NYSE itself is not receiving any shares of Holdco under the merger, it is therefore not affected by the NYSE seatholders receiving less, rather than more Holdco shares. On this basis, plaintiffs argue they have sufficiently alleged a harm that is distinctly suffered by shareholders rather than the corporation.
Further, plaintiffs allege harm from the five percent hold-back provision which entitles certain NYSE employees, including Thain and a number of nonseatholders, to receive up to five *272 percent of the shares of the merged corporation, which is valued at approximately $150 million. Plaintiffs argue that granting millions of dollars worth of equity in the merged corporation to nonseatholders is tantamount to a conversion of equity, as it is the NYSE seatholders, rather than nonequity holding NYSE employees, who are entitled to receive equity in the merged corporation. As with the reduced payout of equity and granting too few shares of stock in the merged corporation to seatholders, plaintiffs argue that the NYSE is not harmed by this payout of shareholders’ equity to nonseatholders. Rather the alleged harm affects the rights of the NYSE seatholders to realize the full, overall value of the equity as it appears on the balance sheet of the NYSE.
As for the merger term that allocates 70% of the merged corporation to the former NYSE seatholders and 30% to former Archipelago shareholders, plaintiffs maintain that this allocation is allegedly based on a discounted valuation of NYSE seats. The 70/30 allocation allegedly does not accurately reflect the amount of seatholders’ equity value that the NYSE is contributing to the merged corporation. Plaintiffs allege that the discounted valuation of seats actually benefits Archipelago. Moreover, in agreeing to this allocation ratio, the NYSE defendants accepted at face value Archipelago’s projections of revenue and earnings, in addition to the alleged undervaluation of NYSE seats.
Under the Tooley test discussed above, the loss of seats in exchange for an unfairly low payout of shareholders’ equity individually harms the seatholders and is otherwise not dependent on a harm to the NYSE. In contrast, the NYSE is being benefitted, or, put differently, is not injured; by paying less equity out to the seatholders, the NYSE retains more shareholders’ equity, translating into more assets appearing on the NYSE balance sheet than is being transferred to the merged corporation,[22] which cannot be characterized as an injury to the corporate entity. As in Bernstein discussed above, the seatholders’ interest in obtaining more shareholders’ equity for being cashed out of the present NYSE is at odds with the NYSE’s interest in transferring more shareholders’ equity to the merged corporation. Moreover, under the second prong of Tooley, there is no monetary relief that would go to the NYSE for the alleged breaches of duty that results in more, rather than less, assets *273 appearing on its balance sheet as a result of the lower payout of shareholders’ equity.
While the First Department has not yet considered whether the harm, characterized as it is here, to shareholders’ equity interests is separate and distinct from a harm to the corporation and thus maintainable as a direct claim, Strougo v Bassini did recognize such a harm as individual and otherwise not dependent on a harm to the corporation. (Strougo v Bassini, 282 F3d 162 [2d Cir 2002], on remand 258 F Supp 2d 254 [SD NY 2003].) In Strougo, the Second Circuit, applying Maryland law, vacated the dismissal for lack of individual standing a shareholder’s class action complaint alleging breach of fiduciary duty on the part of directors and officers of an equity fund undertaking an allegedly coercive rights offering. (Strougo, 282 F3d at 166.) The plaintiff in Strougo argued that the claim was not derivative because the injury alleged was not based on harm to the fund’s assets, rather the harm was that which flowed from the coercive rights offering that unfairly set the exercise price of the rights at a deep discount from the prerights offering value, resulting in a reduction of the net equity value of shares owned by shareholders not participating in the rights offering, while actually increasing the fund’s assets. (Strougo, 282 F3d at 174-175.)
The court agreed with the plaintiff that the complaint stated a direct harm to shareholders, as the loss in value of the equity positions of the nonparticipating shareholders, as opposed to a reduction in the value of the shares, is distinct from a harm to the corporation. (Id. at 175.) In recognizing that shareholders’ primary interest is equity and the overall value of their equity, the court noted that a corporation “cannot have an equity interest in itself. As reflected in corporate balance sheets, equity is not an asset to the corporation, but indeed its opposite: a claim on assets.” (Strougo, 282 F3d at 175 n 10.)
Assuming plaintiffs’ allegations as true for the purposes of deciding these motions, while liberally construing the complaints in plaintiffs’ favor (Wilson v Hochberg, 245 AD2d 116 [1st Dept 1997]), the alleged disparate allocation of equity, resulting in more seatholders’ equity being contributed to the merged corporation, nonseatholder employees, and Archipelago shareholders, while “short-changing” NYSE seatholders from realizing the full value of their equity positions in the NYSE by a higher payout of shareholders’ equity, constitutes a separate and distinct harm to NYSE seatholders that is redressable by *274 the assertion of direct claims against the corporation and its fiduciaries. Accordingly, insofar as the Higgins and Caldwell complaints allege injuries that result in harm to NYSE seatholders’ equity interests, as opposed to the NYSE’s assets, plaintiffs have standing to assert direct causes of actions for breach of fiduciary duty.
Plaintiffs additionally argue that the lock-up provisions harm NYSE seatholders by preventing them from freely transferring their shares in the merged corporation for up to five years. However, only certain of Archipelago’s shareholders, representing approximately 40% of its outstanding shares, will be subject to any lock-up provisions with respect to their Holdco shares. Furthermore, plaintiffs allege that despite hazard’s failure to evaluate the financial effect of the lock-up provisions on NYSE seatholders in rendering its fairness opinion, the NYSE Board relied on the opinion as a basis for voting to unanimously approve the merger.
Defendants countered at oral arguments that the alleged harm flowing from the lock-up provisions is derivative, characterizing the claims as cpraplaining of the diminishing value of the NYSE’s assets, “[w]hat they’re [plaintiffs] claiming is that the lockup [provision] is worth a certain amount of money which is reducing, again, the value of the assets of the Exchange [NYSE].”[23]
Defendants again fail to recognize the nature of the harm plaintiffs allege. Rather than arguing that the merger is causing NYSE’s assets to diminish, plaintiffs maintain that the consequences of a lower payout of shareholders’ equity results in more assets remaining with the NYSE, while the lock-up provisions are unfairly burdening former NYSE seatholders’ Holdco shares, and, moreover, that the Board approved the provision in reliance on hazard’s flawed fairness opinion. As plaintiffs have asserted a wrong that is personal to NYSE seatholders and otherwise separate and distinct from a wrong to the NYSE, plaintiffs have sufficiently stated a direct claim against the NYSE defendants.
Defendants’ insistent reliance on Alpert v National Assn. of Sec. Dealers, LLC (7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U] [2004]) for the proposition that a loss in members’ seat value stemming from a breach of fiduciary duty where directors agreed to an allegedly unfair acquisition, states a de *275 rivative claim only, is misplaced.[24] Defendants cite a line from Alpert where the court, in holding that plaintiffs lacked standing to assert direct claims, stated, “[T]o the extent that plaintiffs’ allegations are based upon a loss in Amex [American Stock Exchange] value, or lost business and investment opportunities, ‘a shareholder has no individual cause of action’ for losing ‘the value of his investment’ ” (Alpert v National Assn. of Sec. Dealers, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *18 [Sup Ct, NY County 2004]). Relying on Alpert, defendants maintain that all of the merger terms plaintiffs complain of are derivative because the claims go to the alleged reduction in the value of NYSE’s assets.[25]
Alpert is not analogous, however, to the extent that Alpert involved the alleged breach of fiduciary duty that reduced the value of members’ seats (Alpert, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *16), whereas the alleged breach here is partially based on the extinguishment of the members’ seats altogether, including all of the rights that ownership of a NYSE seat carried, such as trading and leasing rights, that is allegedly not being properly compensated for in the conversion of seats to shares in the merged corporation. In this sense, plaintiffs are being “cashed out” of the NYSE, as they are being paid a sum of money, $300,000, for the loss of their seat, rather than shares. Therefore, while plaintiffs are retaining an equity interest in the merged corporation by the receipt of one share of Holdco common stock, the primary feature of the NYSE seatholders’ ownership interest, the seats, are being extinguished for an allegedly unfair price, that allegedly came about by numerous breaches of duty on the part of the directors. Therefore, the “cashing out” of plaintiffs’ seats at an allegedly unfairly low price is akin to the Bernstein plaintiffs sale of his shares in the corporation at an unfairly low price.
Alpert is distinguishable, moreover, because the corporations involved in the Alpert action were incorporated in Delaware, and therefore the court was necessarily applying Delaware law. To the extent that the court was “considering” New York law in addition to Delaware law because the corporations at issue in *276 the action, while incorporated in Delaware, were licensed to do business in New York (id. at *17), it is well settled that the law of the state of incorporation governs the applicable law. (Hart, 129 AD2d at 179.) Here, the court has no basis to apply any other state’s law, as perhaps in Alpert, because in addition to being incorporated in New York, the NYSE and Archipelago both primarily conduct business in New York.
Furthermore, the transaction at issue in Alpert was drastically different than the merger at issue in this action. Alpert involved a challenge to a transaction that would unwind a previous merger agreement in which the National Association of Securities Dealers (NASD) acquired Amex from the Amex Membership Corporation (AMC). (Alpert, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *2.) Under the unwinding agreement, NASD would be released from all of its obligations to Amex that existed under the previous merger agreement, such as providing Amex with a multimillion dollar technology budget to upgrade its system to make it comparable with the National Association of Securities Dealers Automated Quotations (NASDAQ). (Id. at *1-3.) The unwinding of the previous merger was allegedly spurned in part by NASD’s sale of a significant portion of its interest in NASDAQ, which purportedly frustrated the main purpose behind the NASD-Amex merger, which was to enable NASDAQ and Amex to become sister corporations rather than competitors, which is what NASD’s sale of a portion of NASDAQ resulted in. (Id. at *3-4.)
The plaintiffs in Alpert alleged harm, in part, from the loss in value to Amex seats that resulted from the unwinding of the previous merger that allegedly rendered Amex technologically obsolete and burdened in debt to NASD. (Id. at *4.) As previously stated, this action, in contrast, is not about the loss in value to seats belonging to members of an exchange; rather, it is about the complete extinguishment of the primary feature of NYSE members’ rights, the seats, the loss of which plaintiffs allege is not being adequately compensated for in the merged corporation, while Archipelago shareholders are being overcompensated.
Further distinguishing this action, in Alpert, unlike here, there were no allegations that the defendant directors were not fully informed about the transaction at issue, or were relying on flawed information. Rather, as the Alpert court noted, “The essence of plaintiffs’ argument is not that the AMC Directors were not fully informed about the . . . Transaction, but rather, that the AMC Directors had ample information, yet rendered a *277 decision with which plaintiffs are dissatisfied.” (Id. at *13 [internal quotations marks omitted].)
Here, plaintiffs’ allegations of breach of fiduciary duty are based, in part, on assertions that hazard provided a flawed fairness opinion that the Board relied on in its deliberation. Specifically, plaintiffs allege that hazard miscalculated the value of the revenue generated by seatholders who lease their seats, hazard allegedly estimated that seatholders who lease their seats receive revenue of $25 million annually, based on an average lease price of $25,000 per seat, for 1,000 seats. It is indisputable that the NYSE is comprised of 1,366 seats, and plaintiffs maintain that seats are leased at an average price of $60,000 annually, representing $82 million in revenue. Further, plaintiffs allege that this undervaluation actually inures to the benefit of the NYSE, because the NYSE is paying the seatholders less than what the value of their equity entitles them to, freeing up more equity to be transferred to the balance sheet of the merged corporation.
The court is mindful that while it accepts plaintiffs’ theories of direct shareholder recovery, ultimately, it is premature to determine if there are indeed merits to the claims asserted. However, as this is a motion to dismiss the pleadings, all inferences are to be drawn in favor of the plaintiffs (Rovello v Orofino Realty Co., 40 NY2d 633, 635 [1976]), and plaintiffs are therefore permitted to conduct discovery to ascertain the merits of the claims. For the foregoing reasons, plaintiffs’ complaints adequately state direct claims for relief against the NYSE defendants for breach of fiduciary duty. However, plaintiffs must still allege well-pleaded facts sufficient to deprive NYSE’s Board of the protections of the business judgment rule, discussed below.
B. The Business Judgment Rule
Defendants maintain that the business judgment rule insulates the decisions of the NYSE Board from evaluation by the court, as plaintiffs have failed to either allege facts of bad faith or fraud necessary to overcome the presumptive rule, and otherwise have failed to plead allegations of self-dealing with sufficient particularity. Defendants further argue that Goldman’s role as facilitator of the merger was unanimously approved by 11 directors, all of whom but Thain are arguably independent.
In recognition that courts are “ill equipped to evaluate the complexities of [directors’ business] decisions” (Fair v Fuchs, *278 219 AD2d 454, 456 [1st Dept 1995]), adherence to the business judgment rule bars judicial inquiry into the propriety of actions taken by corporate directors made in good faith on behalf of the corporation. (Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327 [2005] [Court of Appeals recently applied the business judgment rule to the decision of the board of a not-for-profit corporation].) The presumptive applicability of the business judgment rule is rebutted, and judicial inquiry thereby triggered, however, by a showing that a breach of fiduciary duty occurred (Jones v Surrey Coop. Apts., 263 AD2d 33, 36 [1999]), which includes evidence of bad faith, self-dealing (Van Der Lande v Stout, 13 AD3d 261, 262 [1st Dept 2004]), or by decisions made by directors demonstrably affected by inherent conflicts of interest (Wolf v Rand, 258 AD2d 401, 404 [1st Dept 1999]). Thereafter, the burden to prove the fairness of the challenged acts shifts to defendants. (Wolf, 258 AD2d at 404.)
1, The Fiduciary Duty of Loyalty
The fiduciary duty of loyalty imposes on corporate directors an obligation not to “assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation ... as [directors] owe [the corporation] their undivided and unqualified loyalty.” (Foley v D’Agostino, 21 AD2d 60, 66-67 [1st Dept 1964] [internal quotation marks omitted].) Accordingly, directors should not be permitted to “profit personally at the expense of the corporation, [n]or must they allow their private interests to conflict with corporate interests.” (Foley, 21 AD2d at 67.)
Director conflicts of interest are typically found where either a director stands to receive a personal benefit from the transaction at issue that is different from that received by all shareholders, or where there is a loss of independence insofar as a director with no personal interest in a transaction is otherwise controlled by an interested director. (Marx v Akers, 88 NY2d 189, 200-202 [1996].) A director is considered to have lost his/ her independence where she/he is dominated or otherwise controlled by an individual or entity interested in the transaction at issue. (Rales v Blasband, 634 A2d 927, 936 [Del Sup Ct 1993].) Additionally, charges of interest must be pleaded with particularity. (Bansbach v Zinn, 1 NY3d 1, 11 [2003].)
Therefore, determination that a board participating in a decision has lost its independence does not merely turn on whether the majority of the board voting is interested (Pallot v Peltz, 289 AD2d 85, 86 [1st Dept 2001]), as interest is not merely limited *279 to financial interest; rather it can be established by demonstrating that the board itself is controlled by an interested director. (Barbour v Knecht, 296 AD2d 218, 224-225 [1st Dept 2002].)
Plaintiffs allege that Thain engaged in self-dealing by putting the financial interests of himself and Goldman above that of the NYSE seatholders. Further, plaintiffs allege that Thain stands to receive a direct personal financial benefit from the unfair terms of the merger, and given his large financial stakes in Goldman. Plaintiffs additionally maintain that Thain effectively dominated and controlled the Board, and as a consequence, the Board merely “passively rubber-stamped” the transaction. Moreover, plaintiffs maintain, in tandem with allegations of Thain’s domination, that the majority of the Board was incapable of exercising independent business judgment given their extensive business and employment relations with Goldman and other financial institutions on Wall Street with large ownership interests in Archipelago, JP Morgan and Merrill Lynch.
Plaintiffs’ complaint sufficiently details Thain’s alleged dual loyalties to the NYSE and to Goldman. Thain’s employment history at Goldman spans more than 11 years, where he held numerous executive and managerial positions including president, CEO, and CFO. Just prior to joining the NYSE, Thain was the president and CEO of Goldman, and still owns more than 2.2 million shares of Goldman stock, worth approximately $225 million.
Goldman, in turn, has been substantially involved in Archipelago since its creation in 1996, providing significant investment capital, in addition to owning approximately 15.6% of its stock; the market value of this interest has allegedly been boosted by approximately $170 million since the announcement of the merger. Moreover, Goldman owns 21 seats in the NYSE, consequently putting it in a position to own more than five percent of the merged corporation. Goldman additionally acted as the lead underwriter for Archipelago’s IPO in 2004.
Merger discussions between Archipelago and the NYSE allegedly began when a Goldman director brought together Archipelago CEO, Putnam, and the NYSE’s CFO. Within a week, Thain and Archipelago were meeting to discuss the possibility of a merger, and, thereafter, Thain began meeting regularly with current Goldman CEO and chairman and former NYSE director, Paulson, along with Putnam. These meetings were followed by both the NYSE and Archipelago’s retention of Goldman to provide financial services, which included the perfor *280 manee of a pro forma evaluation analysis of a combined entity that might result from a merger. Under separately negotiated engagement letters, Goldman stood to receive $7 million in advisory fees alone if a combination between the NYSE and Archipelago came to fruition.
Further, plaintiffs allege that despite Thain’s numerous ties to Goldman such that he personally stands to gain tremendously from a financial boost to Goldman through its Archipelago holdings, Thain chose only to remove himself from the vote to retain Goldman’s financial services in the merger and the compensation Goldman would receive for these services, although he did not remove himself from any of the negotiations, deliberations, or the vote itself that gave rise to the merger. Thain’s participation in the deliberative process was also in contravention of NYSE Constitution, article iy § 15, which provides, “[n]o director shall participate in the deliberation or adjudication of any matter in which he or she is personally interested.”
In addition to alleging well-pleaded facts of Thain’s and Goldman’s interest in the merger, plaintiffs maintain that Goldman, through Thain, was able to influence and ultimately dominate the negotiations, ensuring that Archipelago received the most favorable terms in the merger. This alleged domination resulted in the loss of Board independence. To establish loss of independence resulting from an interested director’s dominance, plaintiffs must allege particularized facts sufficient to raise the suspicion that the directors were somehow beholden to Thain. (Health-Loom Corp. v Soho Plaza Corp., 209 AD2d 197, 198 [1st Dept 1994].) Plaintiffs allege that Thain held numerous discussions with Goldman and Archipelago CEO, Putnam, regarding the structure and terms of the merger. Moreover, it was by Thain’s recommendation that Goldman, and subsequently hazard, both allegedly conflicted, were retained to provide financial services to the NYSE.
While such allegations are sufficient to demonstrate Thain’s interest in the merger such that he is poised to receive some personal financial benefit from the merger different from NYSE seatholders (Marx, 88 NY2d at 200-202), plaintiffs must allege well-pleaded facts sufficient to demonstrate Thain’s coercive control of the Board. (Health-Loom Corp. v Soho Plaza Corp., 209 AD2d 197, 198 [1st Dept 1994]; see also Bansbach, 1 NY3d at 12 [demand on board was excused as futile where evidentiary record on a motion for summary judgment demonstrated that a self-interested director dominated and controlled board members *281 such that they were incapable of making an impartial decision as to whether to pursue a derivative action].) In this regard, plaintiffs’ complaint fails.
Accordingly, the claim for breach of fiduciary duty against NYSE Board members is dismissed insofar as plaintiffs allege domination by Thain. Plaintiffs shall have leave to replead particularized facts of specific instances of Thain’s coercive control, demonstrating that the Board’s will was effectively supplanted by Thain’s. (See Health-Loom Corp., 209 AD2d at 198.)
Plaintiffs additionally seek to establish that Thain’s interestedness notwithstanding, the majority of the purportedly “independent” Board members have extensive business and employment relations with Goldman, JP Morgan and Merrill Lynch, all of whom have significant interests in Archipelago, sufficient to cast doubt on their independence.
Defendants rely on Alpert for the proposition that “remote ties” to Goldman or Archipelago are not enough to form the basis of an allegation of self-interestedness or lack of independence. Alpert is additionally not factually analogous on the issue of dominance, however. The Alpert plaintiffs argued demand futility on the ground that a self-interested director controlled the outside directors, and that the outside directors’ personal relations with the self-interested director cast doubt on their independence. (Alpert, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *9.) The court found that the plaintiffs failed to allege domination with particularity, and, moreover, that plaintiffs’ allegations regarding the extent of personal relations with the self-interested director were insufficient to cast doubt on the outside directors’ independence. (Id. at *10.) While the court correctly stated the law, Alpert is not applicable because the cases on which the court relied involved the review of evidentiary records on a motion for summary judgment. (See Strougo v Padegs, 27 F Supp 2d 442, 450 [SD NY 1998] [application of Maryland law to a motion to dismiss the complaint or, alternatively, for summary judgment, upon review of District Court’s interpretation of Maryland law]; see also Alpert, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *10.)
Moreover, the Alpert court improperly relied on Bansbach, a Third Department case, considering whether the evidentiary record established that a director’s personal and prior business relations resulted in a loss of independence on a summary judg *282 ment motion. (Bansbach v Zinn, 294 AD2d 762, 763 [3d Dept 2002], lv granted 99 NY2d 504 [2003], affd as mod 1 NY3d 1 [2003], rearg denied 1 NY3d 593 [2004]; see also Alpert, 7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U], *10.) The decision in Bansbach upon which Alpert partially relies was subsequently modified by the Court of Appeals, which, contrary to the decision of the trial court, did find that the evidentiary record contained facts that supported plaintiffs allegations that the directors were dominated and controlled by a self-interested director, who by reason of his position, in addition to his personal and business connections to the other directors “caused them to place his [the self-interested director’s] interests above those of the corporation,” therefore rendering a demand on the board futile. (Bansbach v Zinn, 1 NY3d 1, 12 [2003], rearg denied 1 NY3d 593 [2004].)
Moreover, it is firmly established that the court’s inquiry on a motion to dismiss the complaint for failure to state a cause of action and on a summary judgment motion, as in Bansbach, are drastically different. (Tenzer, Greenblatt, Fallon & Kaplan v Capri Jewelry, 128 AD2d 467, 469 [1st Dept 1987].) On a motion to dismiss the complaint pursuant to CPLR 3211 (a) (7), the court is necessarily assuming the truth of the allegations asserted in the pleadings in order to “determine simply whether the facts alleged fit within any cognizable legal theory.” (Morone v Morone, 50 NY2d 481, 484 [1980].) Even in the context of the business judgment rule, this distinction does not fundamentally change, and the complaint will be sustained if it contains allegations sufficient to demonstrate that directors did not act in good faith or were otherwise interested, as “[p]rediscovery dismissal of pleadings in the name of the business judgment rule is inappropriate.” (Ackerman v 305 E. 40th Owners Corp., 189 AD2d 665, 667 [1st Dept 1993].) On a motion for summary judgment, in contrast, the court is necessarily searching the record to determine the sufficiency of the underlying evidence. (Tenzer, 128 AD2d at 469.)
Plaintiffs’ demonstrations that six NYSE Board members, Shapiro, Woolard, Carter, McDonald, Rivlin and Jackson, have both personal and business relations with Goldman, where plaintiffs have otherwise already succeeded in casting doubt on Thain and Goldman’s interest, in addition to Goldman’s provi *283 sion of financial services to both the NYSE and Archipelago in the same transaction is, simply put, impressive.[26]
While there are no allegations that the six Goldman affiliated directors personally benefitted from the merger, as alleged with Thain, plaintiffs have otherwise sufficiently alleged that their relations with Goldman caused them to disregard the primary corporate interest of the NYSE of which they are charged with, in order to accommodate Goldman’s interests. Moreover, the denial of a motion to dismiss the pleadings is ultimately within the court’s discretion, and the court concludes that plaintiffs have raised doubt of the Board members’ independence sufficient to overcome dismissal at this stage in the pleading.
2. The Fiduciary Duty of Due Care and Good Faith
The fiduciary duty of due care, in turn, obligates directors to act in an informed and “reasonably] diligen[t]” basis in “considering material information.” (Hanson Trust PLC v ML SCM Acquisition, Inc., 781 F2d 264, 274 [2d Cir 1986].) Therefore, director decisions are protected by the business judgment rule only to the extent that their decisions actually evince their business judgment. (Hanson Trust PLC, 781 F2d at 275.) Another component of a fiduciary’s duties to the corporation is that directors are obligated to exercise all their responsibilities, including the decision to approve a merger, in good faith. (Alpert v 28 Williams St. Corp., 63 NY2d 557, 568 [1984].) As with the duty of loyalty, plaintiffs bear the burden of demonstrating that a majority of directors involved in voting on the challenged transaction were not reasonably informed. (Stoner v Walsh, 772 F Supp 790, 801 [SD NY 1991].)
Notwithstanding Thain and Goldman’s allegedly conflicted role in the merger, plaintiffs allege that in unanimously approving Goldman and Hazard’s participation in the merger, the Board “passively rubber-stamped” the decision, relying entirely on a flawed fairness opinion provided by Hazard. Plaintiffs maintain that the Board’s retention of Hazard as financial advisor, by Thain’s recommendation, was inappropriate in that Hazard was incapable of rendering an independent fairness opinion, and, moreover, Hazard produced an incomplete, and, at times, inaccurate opinion, the Board’s reliance on which was tantamount to a breach of the fiduciary duty of due care.
*284 Specifically, plaintiffs allege that the Board retained hazard solely on Thain’s recommendation and without any due diligence whatsoever, which would have revealed that hazard’s IPO was being underwritten by Goldman at the time, and that hazard was therefore incapable of independently conducting a fairness opinion. Additionally, hazard was being represented in its IPO by the same law firm as the NYSE, Wachtell.
hazard further disclaimed that any of the financial information contained in the fairness opinion was independently verified, stating:
“We have relied upon the accuracy and completeness of the foregoing information, and have not assumed any responsibility for any independent verification of such information or any independent valuation or appraisal of any of the assets or liability of the Company [NYSE] or AHI [Archipelago], or concerning the solvency or fair value of the Company or AHI
Furthermore, plaintiffs allege that hazard made significant errors and omissions, such as failing to value the effect, and/or assumed no effect, of the lock-up provisions imposed on former NYSE seatholders in the merger, which the Board consented to.
“In rendering our [hazard’s fairness] opinion we have with your [NYSE Board] consent assumed no effect on the value of the NYSE Consideration [$300,000 payout to seatholders] arising from restrictions on transfer of the Common Stock of [Holdco] to be received in the NYSE hhC Merger.” (Emphasis added.)
Plaintiffs further allege that hazard’s fairness opinion contained material errors. As discussed earlier, hazard miscalculated the value of the revenue generated by seatholders who lease their seats, hazard estimated that seatholders who lease their seats receive revenue of $25 million, based on an average lease price of $25,000 per seat, for a total of 1,000 seats. The NYSE is comprised of 1,366 seats, and seats are leased at $60,000 annually. Despite its review of the fairness opinion, the Board was apparently contented that its conclusions were sufficient for the purpose of adjudicating on the merger, which necessarily was due, in part, to a conclusion that the merger consideration was fair, despite hazard’s express disclaimers that it had assessed all of the financial information, and, further, that its calculations were based, in part, on the presence of 1,000 NYSE seats, a striking error. As Hanson noted, discharg *285 ing the duty of care includes, in part, satisfactorily overseeing outside financial advice upon which the Board relies. (Hanson Trust PLC, 781 F2d at 276.) However, plaintiffs’ allegations raise doubt that the Board effectively discharged its obligation to oversee hazard, such as by, at a minimum, ensuring that hazard was basing its fairness opinion on complete and accurate information.
Plaintiffs further allege that the directors breached their duty of due care by approving the retention of Goldman to provide financial services to the NYSE, given many Board members’ substantial relations with Goldman, in addition to Goldman’s relations with Archipelago, while consenting to Goldman’s provision of services to both the NYSE and Archipelago in the same transaction. According to plaintiffs, the directors were aware that Goldman was simultaneously providing services to Archipelago from the engagement letter, and further due diligence would have revealed the extent of Goldman’s stock holdings in Archipelago.
As the duty of due care imposes on directors an obligation to act on a reasonably informed basis (Hanson Trust PLC, 781 F2d at 274-275), the court is satisfied that the facts alleged in the complaints and accompanying affidavits sufficiently state that, by relying on hazard, an allegedly conflicted financial advisor, to render a fairness opinion that contained serious omissions, such as failure to assess several key terms of the merger that plaintiffs complain of, in addition to errors, the directors did not discharge their duty of due care. Such alleged acts of breach are actionable, as “[directors may be liable to shareholders for failing reasonably to obtain material information or to make a reasonable inquiry into material matters.” (Id. at 274-275.)
Kimeldorf, upon which defendants rely, is inapposite (Kimeldorf v First Union Real Estate Equity & Mtge. Invs., 309 AD2d 151 [1st Dept 2003]). There, the Court reviewed the grant of a preliminary injunction staying the merger of a real estate investment fund, subsequent to a shareholder vote that overwhelmingly approved the merger. Granting an application for a preliminary injunction necessarily involves determination of the likelihood of the ultimate success of the merits of the claims asserted (J. A. Preston Corp. v Fabrication Enters., 68 NY2d 397, 406 [1986]), including making findings of fact. (Hanson Trust PLC, 781 F2d at 273.) Determining whether there is an evidentiary basis for the allegations of the complaint is a wholly improper inquiry on a motion to dismiss the complaint. (Rovello v Orofino Realty Co., 40 NY2d 633, 635 [1976].)
*286 Moreover, in Kimeldorf, the Court specifically found that plaintiffs failed to even identify any particular wrongdoing on the part of the directors in support of their breach of fiduciary duty claim, and, further, found that plaintiffs failed to offer sufficient justification for overriding the business judgment rule, as allegations of unfair dealing were rebutted by full, accurate and detailed disclosure on the part of the directors. (Kimeldorf \ 309 AD2d at 156-158.) Finally, as for the plaintiffs allegations of breach of fiduciary duty stemming from a self-interested director, the Court found that because the director had the same personal interest in the transactions as the other shareholders did not render him “self-interested.” (Id. at 159.)
In contrast to the factual record being reviewed in Kimeldorf, plaintiffs here have sufficiently alleged acts of wrongdoing on the part of Thain and Board members that, if proven true in the course of discovery, satisfies a claim for breach of the fiduciary duty of care. As discussed at length above and unlike in Kimeldorf, hazard was not wholly independent at the time it conducted its fairness review of the merger, and, moreover, expressly disclosed that it did not consider the financial soundness of all material terms of the transaction that plaintiffs now complain of, which calls into question the accurateness and comprehensiveness of the fairness opinion relied upon by the Board in rendering its decision to approve the merger.
Finally, unlike in Kimeldorf, where the director’s financial interest in the outcome of the merger was the same as the shareholders (id.), Thain allegedly has a markedly different interests than the NYSE seatholders, according to plaintiffs, due to his ownership of 2.2 million Goldman shares, while Goldman is a principal Archipelago shareholder and thus a principal beneficiary of the unfair terms of the merger.
28 Williams St.,[27] also relied on by defendants, is similarly inapposite; there, the Court reversed a judgment rendered in favor of minority shareholders that held directors of a partnership liable for approving a merger in the absence of findings of fact at a trial on the merits, of either a conflict of interest, self-dealing, or fraud on the part of directors, therefore providing no justification to override the business judgment rule. (Alpert v 28 Williams St. Corp., 91 AD2d 530, 530-531 [1st Dept 1982], reh denied 64 NY2d 1041 [1985].) In contrast, here, unlike in 28 *287 Williams St., plaintiffs have alleged facts establishing conflicts of interests and self-dealing on the part of key players involved in the merger agreement, in addition to the failure of Board members to reasonably inform themselves of the financial consequences of several merger terms, sufficient to overcome the presumption of the business judgment rule at the pleading stage.
Therefore, the court is satisfied that the material allegations of the complaints, insofar as they allege breaches of the fiduciary duty of loyalty and due care on the part of NYSE Board members, are sufficient to overcome the presumptive applicability of the business judgment rule.
C. Aiding and Abetting Breach of Fiduciary Duty against Goldman
Goldman moves to dismiss the claim against it for aiding and abetting breach of fiduciary duty on the grounds that plaintiffs have failed to plead with requisite particularity under CPLR 3016 (b), and for failure to state a cause of action. The First Department has subordinated the pleading requirement of CPLR 3016 (b) with the notice standard of CPLR 3013, however (Wiener v Lazard Freres & Co., 241 AD2d 114, 123 [1st Dept 1998], appeal withdrawn 2004 NY App Div LEXIS 10209 [2004]), and generally complaints will be sustained where supporting affidavits are sufficiently detailed to apprise defendants of the conduct upon which the claim is predicated. (Ackerman v Vertical Club Corp., 94 AD2d 665, 666 [1st Dept 1983], appeal dismissed 60 NY2d 644 [1983].) Therefore, the principal inquiry on the motion to dismiss this claim is whether the pleadings are sufficiently detailed to apprise Goldman of the conduct upon which the claim for aiding and abetting breach of fiduciary duty is asserted. (Wiener, 241 AD2d at 123.)
A claim for aiding and abetting fiduciary duty requires “(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach.” (Louis Capital Mkts., L.P. v REFCO Group, Ltd., LLC, 9 Misc 3d 283, 286 [Sup Ct, NY County 2005, Ramos, J.].) Additionally, “Anyone who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage” (id. at 287). Plaintiffs further must demonstrate actual knowledge, as opposed to merely constructive knowledge (Kaufman v Cohen, 307 AD2d 113, 125 [1st Dept 2003]), in addition to “substantial assistance” on the part of the alleged aider and *288 abettor. (Louis Capital Mkts., 9 Misc 3d at 287.)
As discussed above, plaintiffs’ claims for breach of the fiduciary duties of loyalty, due care and good faith on the part of the NYSE defendants are viable. Therefore, in order to succeed on a claim for aiding and abetting breach of fiduciary duty, plaintiffs must sufficiently allege that Goldman had actual knowledge of the breach of duty, rather than mere constructive knowledge. (Kaufman v Cohen, 307 AD2d 113, 125 [1st Dept 2003].) While attempting to prove what is in a defendant’s mind is extremely difficult, at a minimum, plaintiffs may not merely rely on conclusory and sparse allegations of knowledge of the primary breach of fiduciary duty on the part of the aider and abettor. (Kaufman, 307 AD2d at 125.)
Goldman vigorously denies having either any knowledge of a breach by the NYSE defendants or providing substantial assistance to the NYSE defendants in their alleged breach. Goldman submits the engagement letter in support of its motion for dismissal. Goldman maintains that the engagement letter, under which it was retained by the NYSE, acknowledges that it was additionally providing financial services to Archipelago, services that were limited to facilitating merger discussions, although pro forma valuations were also performed. The engagement letter expressly discloses that Goldman would not negotiate any terms of the merger, and further obligates the NYSE to retain an outside financial advisor to perform a fairness opinion.
The engagement letter states, in part:
“The Company [NYSE] understands and acknowledges that we are rendering services simultaneously to the Company and to Archipelago in connection with a Transaction. The Company understands th[at] potential conflicts of interest, or a perception thereof, may arise as a result of our rendering services to both the Company and to Archipelago . . . .”
Goldman’s disclosure to the NYSE Board of the potential conflicts of interest involved in its provision of services to both corporations does not necessarily lead to the conclusion that Goldman did not provide substantial assistance or otherwise aid and abet the NYSE defendants’ breach of fiduciary duty, as plaintiffs maintain. While the engagement letter, in revealing the potential conflicts involved in its participation in the merger, may in fact have been Goldman’s attempt to insulate itself from *289 appearances of impropriety, however, by simply disclosing the potential conflicts to the NYSE Board, does not necessarily absolve it of potential liability for its role in the alleged breach of fiduciary duty. Therefore, while Goldman claims, that the engagement letter establishes that it could not have had “actual knowledge” that a breach of fiduciary duty was committed by the NYSE defendants, the court disagrees. Rather, the engagement letter establishes that Goldman was aware of conflicts. Whether these conflicts are a breach of fiduciary duty is a matter for a jury.
Goldman additionally argues that the performance of routine advisory or financial services, without more, cannot be the basis for aiding and abetting liability. For this proposition, Goldman relies on In re Worldcom, in which a District Court dismissed a class action claim for aiding and abetting common-law fraud asserted against lead underwriters who provided financial services, on the ground that plaintiffs failed to allege actual knowledge of the fraud. (In re World-Com, Inc. Sec. Litig., 382 F Supp 2d 549 [SD NY 2005].) Goldman mischaracterizes the District Court’s basis for dismissal of the claim for aiding and abetting fraud against defendant Citigroup, however. Rather than rejecting plaintiffs’ theory that the lead underwriters aided and abetted fraud by assisting in the preparation of false and misleading documents and subsequently disseminating those documents, in finding that plaintiffs’ complaints only alleged Salomon Smith Barney, Inc. participated in the alleged fraud through preparation of misleading registration statements, the court sustained the claim against it while dismissing the aiding and abetting claim against Citigroup, as all allegations of aiding and abetting liability were aimed at Salomon. (382 F Supp 2d at 558 n 16.)
Goldman’s reliance on Ryan v Hunton & Williams is similarly misplaced (Ryan v Hunton & Williams, 2000 WL 1375265, *10-11, 2000 US Dist LEXIS 13750, *29-30 [ED NY 2000]). There, plaintiffs asserted a claim for aiding and abetting fraud against a bank for failure to shut down accounts being used in an alleged fraudulent scheme and for not informing plaintiffs of the suspected fraud. In dismissing the claim against the defendant bank for aiding and abetting fraud, the court stated that “[a]bsent a confidential or fidu *290 ciary relationship between the plaintiff and the aider and abettor, the inaction of the latter does not constitute substantial assistance warranting aider and abettor liability.” (Ryan, 2000 WL 1375265, *10, 2000 US Dist LEXIS 13750, *29.) In contrast, plaintiffs’ claim for aiding and abetting breach of fiduciary duty against Goldman in no way resembles the claim for aiding and abetting fraud asserted against a bank for failure to disclose.
Rather, plaintiffs allege that Goldman was providing substantial assistance to the NYSE defendants in breaching their fiduciary duty, by exerting its influence through its former CEO, Thain, former NYSE director and current Goldman CEO Paulson, and other Goldman-affiliated NYSE directors who were overly accommodating to Goldman, in order to structure a deal that benefitted Archipelago. Moreover, rather than disputing Goldman’s “actual knowledge” of the potential conflicts of interest inherent in providing financial services to both corporations in the same transaction, in one of which, Archipelago, Goldman remains one of the largest shareholders, the engagement letter establishes Goldman’s knowledge of the potential improprieties involved in such a role. Accordingly, if plaintiffs succeed in establishing that the NYSE defendants breached their fiduciary duties, in part, by retaining Goldman to provide financial services and otherwise, by permitting Goldman to exert its influence by obtaining more favorable terms in the merger, Goldman’s participation by provision of those services, which it does not dispute, in addition to exerting this alleged improper influence, is tantamount to substantial assistance, sufficient to sustain the claim at the pleading stage.
To the extent that Goldman’s knowledge of the breadth of the NYSE defendants’ alleged breach has not been alleged by particularized facts, its knowledge, ultimately, is a matter for discovery, as much of that information is necessarily in Goldman’s control. (See American Baptist Churches of Metro. N.Y. v Galloway, 271 AD2d 92, 101 [1st Dept 2000] [“what the parties actually knew is a matter for discovery, since much of the information is in defendants’ control”].) Moreover, Goldman has sufficiently been apprised of the conduct upon which plaintiffs’ claim is predicated (Ackerman, 94 AD2d at 666), and thus the notice standard of CPLR 3013 has been met. (Wiener, 241 AD2d at 123.)
*291 Accordingly, it is ordered that the motion to dismiss the Higgins and Caldwell complaints is denied and this action shall continue except to the limited extent of severing and dismissing the claim for breach of the fiduciary duty of loyalty insofar as plaintiffs allege domination.

. The parties have since stipulated to voluntarily discontinue the action against defendant Archipelago, which was “So Ordered” by this court on July 28, 2005. The court will therefore not discuss claims related to it, and Archipelago’s motion to dismiss the Caldwell complaint is therefore permitted to be withdrawn.

. Goldman additionally owns 21 seats in the NYSE, and leases 92 others.

. The $300,000 payout to each NYSE seatholder totals approximately $410,000,000, leaving $575,000,000 in cash and its equivalent on the NYSE balance sheet, that will then be transferred to the merged corporation.

. Allison was previously employed at Merrill Lynch, serving as president and CEO. Merrill Lynch served as an underwriter for Archipelago’s IPO in 2004. Merrill Lynch invested heavily in Archipelago, acquiring a 14.9% equity interest in the corporation.

. Weatherstone previously served as the president and CEO of JP Morgan. JP Morgan served as the lead underwriter of Archipelago’s IPO in 2004, alongside Goldman. JP Morgan also heavily invested in Archipelago, acquiring a 20% equity interest in the corporation.

. Shapiro previously served as the chairman of Monsanto Company, who retained defendant Goldman in the sale of a product line and certain Monsanto assets.

. Woolard previously served as director and chairman of Dupont. The former senior chairman of defendant Goldman, John Weinberg, served as cochairman with Woolard on the Dupont Board.

. Carter is the chairman of the NYSE Board. He previously served as chairman and CEO of State Street Bank & Trust Company, of which defendant Goldman served as financial consultant in connection with the sale of certain of its operations in 1999.

. von der Heyden previously served as the CFO of RJR Nabisco. Goldman allegedly provided investment services to Nabisco in the past.

. Prior to assuming a position on the NYSE Board, McDonald served as a senior officer and director of Pell, Rudman, who retained defendant Goldman as advisor in its acquisition by another corporation.

. Rivlin previously served as White House Budget Director, while Robert Rubin, the former chairman of defendant Goldman, served as Treasury Secretary.

. Jackson previously served on the board of Medtronic, whose former CEO, William George, is currently director of defendant Goldman.

. Counsel for plaintiffs and the NYSE defendants are directed to rule 19 of the Rules of the Commercial Division precluding letters to the court subsequent to argument on a motion, in the absence of the court’s express permission. Any postargument letters sent to chambers have therefore been returned or disposed of unread.

. Claims involving corporate governance are governed by the applicable laws of the state of incorporation. (Hart v General Motors Corp., 129 AD2d 179, 182 [1st Dept 1987].)

. This reasoning is reflected in the seminal New York case Abrams, which states that shareholders may not recover in their individual capacities for the corporation’s losses. (Abrams, 66 NY2d at 951.)

. (See also Donaldson, Mapping Delaware’s Elusive Divide: Clarification and Further Movement Toward a Merits-Based Analysis For Distinguishing Derivative and Direct Claims in Agostino v. Hicks and Tooley v. Donaldson, Lufkin & Jenrette, Inc., 30 Del J Corp L 389, 409.) Donaldson notes that the substance of the emerging merits-based analysis is akin to determining whether the plaintiff has stated a claim on the merits under Delaware Court of Chancery rule 12 (b) (6). (Id. at 409-410.)

. Dieterich v Harrer, 857 A2d 1017, 1026 (Del Ch 2004).

. Bernstein, 231 AD2d at 322-323.

. Tooley, 845 A2d at 1037-1038.

. Shareholder or owners’ equity appears with liabilities oh a corporation’s balance sheet, equaling corporate assets minus liabilities. (Cox, Hazen, O’Neal, Corporations § 19.4 n 1.)

. Currently the NYSE balance sheet indicates that there is a total of approximately $986 million in shareholders’ equity, $1.743 billion in assets, and $723 million in liabilities.

. As defined above, equity is equal to the assets minus the liabilities.

. See transcript of oral argument, July 28, 2005, at 15.

. In oral arguments on this motion, defendants argued, “that [.Alpert] was a case, like this case, brought by members of [an] Exchange claiming that a transaction in which the Exchange, I think that the directors of the Exchange breached their fiduciary duties by agreeing to an acquisition that devalued the value of the seats of the members.” (See transcript of oral argument, July 28, 2005, at 13.)

. See transcript of oral argument, July 28, 2005, at 15.

. The court is unclear as to what significant connection, their holdings in Archipelago notwithstanding, JP Morgan and Merrill Lynch have with the alleged breaches of duty that gave rise to the merger.

. Alpert v 28 Williams St. Corp. (91 AD2d 530 [1st Dept 1982]) has no connection to Alpert (7 Misc 3d 1010[A], 2004 NY Slip Op 51872[U] [Sup Ct, NY County]).